*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 21-BG-0024

IN RE MARY CHRIS DOBBIE, RESPONDENT.

A Member of the Bar of
the District of Columbia Court of Appeals
(Bar Registration No. 975939)

IN RE REAGAN TAYLOR, RESPONDENT.

An Attorney Licensed to Practice Law
in the State of Tennessee

On Report and Recommendation
of the Board on Professional Responsibility
(Disciplinary Docket Nos. 2014-D208 & D209)
(Board Docket No. 19-BD-018)

(Argued May 24, 2022                    Decided December 7, 2023)

*Timothy J. Simeone*, with whom *Thomas B. Mason* and *Amy E. Richardson* were on the brief, for respondent Dobbie.

*J. Alex Little* for respondent Taylor.

*Hamilton P. Fox, III*, Disciplinary Counsel, with whom *Hendrik deBoer*, Assistant Disciplinary Counsel, was on the brief, for the Office of Disciplinary Counsel.

*Donald B. Verrilli, Jr.* filed a brief on behalf of the National Association of Assistant United States Attorneys and Individual Former Assistant United States Attorneys as *amici curiae*, in support of respondents.

*David B. Goodhand*, with whom *Stacy M. Ludwig, Channing D. Phillips, Elizabeth Trosman, John P. Mannarino*, and *Patrice M. Mulkern* were on the brief on behalf of the United States as *amicus curiae*, in support of respondents.

*Samia Fam* filed a brief on behalf of the Public Defender Service as *amicus curiae*, in support of the Office of Disciplinary Counsel.

*Sarah F. Kirkpatrick* filed a brief on behalf of the Mid-Atlantic Innocence Project as *amicus curiae*, in support of the Office of Disciplinary Counsel.

Before DEAHL and ALIKHAN, *Associate Judges*, and GLICKMAN,[*] *Senior Judge*.

Opinion for the court by *Associate Judge* ALIKHAN.

Dissenting opinion by *Associate Judge* DEAHL at page 72.

ALIKHAN, *Associate Judge*: In *Vaughn v. United States*, 93 A.3d 1237 (D.C. 2014), this court held that the United States Attorney's Office for the District of Columbia had violated its constitutional obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose exculpatory information to the defense during the prosecution of Carl Morton and Alonzo Vaughn. We consequently reversed Morton's convictions for aggravated assault and assault on a law enforcement officer. *Vaughn*, 93 A.3d at 1244.[1]

---

[*] Judge Glickman was an Associate Judge of the court at the time of argument. He began his service as a Senior Judge on December 21, 2022.

[1] For reasons not relevant here, we did not reverse Vaughn's convictions on this basis, although we did reverse one of his convictions on other grounds. *Vaughn*, 93 A.3d at 1266, 1270.

After *Vaughn*, Disciplinary Counsel initiated disciplinary proceedings against the prosecutors who committed the *Brady* violation, respondents Mary Chris Dobbie and Reagan Taylor. This case arises out of those proceedings.

In its Report and Recommendation, the Board on Professional Responsibility found that respondents had violated Rules 3.8(e), 8.4(c), and 8.4(d) of the District of Columbia Rules of Professional Conduct. Rule 3.8(e), in relevant part, prohibits prosecutors from "[i]ntentionally fail[ing] to disclose to the defense . . . any evidence or information that the prosecutor knows or reasonably should know tends to negate the guilt of the accused or to mitigate the offense." Rule 8.4(c) proscribes "conduct involving dishonesty, fraud, deceit, or misrepresentation." And Rule 8.4(d) forbids conduct that "seriously interferes with the administration of justice." The Board recommended that respondents be suspended from the practice of law for six months.

We agree with the Board that respondents violated each of these rules, but we disagree as to the appropriate sanction. In recognition of the inadequate and ill-advised guidance provided to respondents by their supervisors; the nature of respondents' Rule 8.4(c) violation; respondents' lack of bad faith and otherwise unblemished records; and our obligation to treat similar cases alike, we instead impose a six-month suspension, stayed as to all in favor of one year of probation.

## I.    Factual Background and Procedural History

### A.    The Collins Report

In late 2007, a brawl erupted at the D.C. Jail, resulting in injuries to several inmates and a guard. Security camera footage of the incident was not very clear, so the U.S. Attorney's Office relied on D.C. Department of Corrections ("DOC") officers to identify the participants in the incident for purposes of investigation and potential criminal charges. One such officer was Lieutenant Angelo Childs, who was not present for the events but claimed to recognize inmates Vaughn and Morton in the video footage. The U.S. Attorney's Office indicted Vaughn and Morton for assault and assigned respondents to prosecute the case.

About six months before the trial, Childs sprayed a chemical agent—think mace or pepper spray—on an inmate, Ernest Heath, during a search for contraband at the jail. Heath's arms were restrained behind his back at the time Childs sprayed him. After this incident, Childs submitted a disciplinary report charging Heath with "Assault Without Serious Injury and Lack of Cooperation." Childs also prepared an incident report defending his own use of force. This latter report stated that Childs had sprayed Heath only after he began "kicking at" a drug-sniffing dog involved in the search. The report also said that Heath had behaved violently and implied—

without explicitly stating—that Heath had been unrestrained at the time Childs had sprayed him. The relevant passage of his incident report read:

> On Tuesday, April 7, 2009, at approximately 2:12 p.m., I was on North Two conducting a shakedown. Inmate Ernest Heath (309-656) refuses to be search [sic] by the K-9. K-9 Handler David Thomas attempted to search Ernest Heath. Inmate Ernest Heath started kicking at the dog. Because Inmate Ernest Heath's actions interfered with the normal operations of the facility, I sprayed one burst of chemical agent. I then instructed Inmate Ernest Heath to seize [sic] his disruptive behavior.
>
> Inmate Ernest Heath was placed in restraints, escorted to male Receiving and Discharge, given a shower, change of underwear and bed linen. After showering, Inmate Heath was escorted to the Infirmary to be medically evaluated and treated. . . .
>
> This incident stemmed from the violent/disruptive behavior of Inmate Ernest Heath.

Childs's supervisor was present for the search and, along with another officer, stated that—contrary to what Childs had claimed in the report—Heath *had* been restrained when Childs used force on him. The supervisor subsequently reprimanded Childs, issuing him a "Letter of Direction" for violating DOC's use-of-force policies.

The fallout from Childs's actions did not end there. DOC opened a formal investigation into the incident, led by investigator Benjamin Collins. Collins reviewed security camera footage of the incident, as well as other evidence, and

issued a report memorializing his findings (the "Collins Report"). The Collins Report is 10 pages long with 76 pages of appendices. It includes three substantive sections: a "Background" section describing the basic facts; an "Investigation" section describing the video footage Collins reviewed, the reports the officers involved filed, and any discrepancies between the two; and a "Findings" section with four formal findings.

The Investigation section makes clear that Childs filed multiple false reports about the Heath incident. It explains that Childs "composed and submitted a Disciplinary Report charging inmate Heath with Assault without Serious Injury and Lack of Cooperation," but that the "[v]ideo footage of the incident *does not support* the allegation that inmate Heath assaulted any Correctional Officer or canine." It also recounts how Childs filed an incident report "suggest[ing] that at the time of the incident, inmate Heath was not restrained, displayed disruptive behavior, and was 'kicking at' the canine causing Lieutenant Childs to use chemical agent to restore 'normal operations.'" But the evidence indicated that in fact "Inmate Heath was in restraints and not a threat to 'normal operations' when he was sprayed with chemical agent by Lieutenant Childs." This section also states that, during an interview, Childs admitted that his incident report "was incorrect and written in error," and that he was issued a Letter of Direction reprimand because of his wrongful use of force.

Two of the statements in the report's Findings section also pertain to Childs. The first is that Childs's use of chemical agent on a restrained inmate was a violation of DOC policy. The second restates the Investigation section's adverse credibility finding about Childs's incident report (although not the one about his disciplinary report): "Lieutenant Angelo Childs submitted a false and or misleading Incident Report of the facts in stating that the inmate was placed in restraints after being sprayed with chemical agent."

In sum, the Collins Report concluded that Childs had violated DOC's use-of-force policy, had been reprimanded for doing so, had filed a false or misleading incident report, and had filed a false disciplinary report accusing Heath of an assault he did not commit. But only the first two of these four conclusions were formal "findings" in the Findings section (a fact that will be relevant later). Several months after Collins issued his report, DOC demoted Childs from the rank of lieutenant to that of sergeant.[2]

Aware that the U.S. Attorney's Office was planning to sponsor Childs in the *Vaughn* prosecution, Collins informed respondent Taylor that "there was an issue" with Childs. He later emailed her his report, although he did not send any of the

---

[2] According to respondent Taylor, Childs took a "voluntary demotion" in lieu of a harsher sanction for his violation of DOC policy.

evidence on which he had relied—i.e., the videotape—or the appendices. Collins also informed Taylor that DOC had demoted Childs.

Respondents recognized that the Collins Report called Childs's credibility into question and sought guidance from their supervisors about how best to proceed. Jeffrey Ragsdale, Chief of the Felony Major Crimes Section at the U.S. Attorney's Office, decided to refer the issue to the *Lewis* Committee, a committee of senior prosecutors that determines whether the government can sponsor the testimony of law enforcement officers with whom there are credibility concerns. Ragsdale emailed John Roth, the head of the committee, a copy of the Collins Report and a summary of the concerns regarding Childs. At this point, the Collins Report was the only information the U.S. Attorney's Office had about the incident; neither respondents nor anyone else had reviewed the underlying evidence on which it was based.[3]

---

[3] Shortly after Ragsdale sent the Collins Report to the *Lewis* Committee, Taylor conducted a standardized "Oral Request for *Giglio* Information" interview with Childs. She asked him: (1) whether there were any findings of misconduct that reflected upon his truthfulness or possible bias; (2) whether there were any past or pending criminal charges or investigations against him; and (3) whether there were any credible allegations of misconduct on his part that reflected on his truthfulness or bias that were subject to a pending investigation. Childs answered "no" to all three questions. Childs also informed Taylor that he had taken "a voluntary demotion because of his excessive force and because he made errors in cutting and pasting in a report." According to Taylor, she believed that Childs had answered her

Although the *Vaughn* trial was only five weeks away when Ragsdale first emailed Roth, the *Lewis* Committee proved less than forthcoming with its guidance. Respondents and Ragsdale followed up, eventually prompting a response from Roth less than two weeks before trial. Roth said that the government could sponsor Childs and instructed respondents to "disclose the report and litigate its admissibility." He also expressed his "personal opinion" that Childs's report was "simply unclear" and that he was not sure "that the DOC conclusion that he lied is supported by the record," but he left it to respondents to "hash that out." Roth formed this personal opinion even though the only "record" before him was the Collins Report, which had concluded in no uncertain terms that Childs had filed two false reports.

While respondents could have followed Roth's instructions by disclosing the Collins Report to the defense directly and then litigating whether it was admissible at trial, that is not the route they took. Instead, Ragsdale recommended that respondents file the report with the court ex parte and under seal and summarize its contents in a motion in limine arguing that the defense should not be permitted to cross-examine Childs about the report or the incident with Heath. This approach was not uncommon in the U.S. Attorney's Office at the time. The purported purpose

---

questions truthfully to the best of his knowledge, because she assumed he was not aware of the Collins Report and its conclusions about his false reporting. There is no evidence that respondents provided any of this information to the *Lewis* Committee.

of proceeding in this manner—submitting evidence only to the court and summarizing it in a motion for the defense—was to disclose to the defense information to which the defense was entitled, while keeping from the defense information that presented a security risk or was otherwise sensitive. According to the respondents, the Collins Report contained "sensitive employment information" and thus needed to be kept from the defense.

### B. Motions Practice Concerning the Collins Report

Five days before trial, respondents filed the Collins Report and an accompanying motion in limine with the court. The stated purpose of the motion in limine was to "limit the scope of cross examination [of Childs] by the defendant" and "preclude the defense from referring to the fact [that] DOC Office of Internal Affairs may have made potentially adverse credibility findings regarding Officer Child's [sic] statement regarding when Inmate A was handcuffed." The motion explained that DOC's investigation "resulted in two findings related to Officer Childs: (1) Officer Childs'[s] use of force violated DOC policy and (2) Officer Childs submitted a false and or misleading statement in reciting the facts." The motion did not, however, mention the Collins Report's additional conclusion that Childs submitted a disciplinary report falsely accusing Heath of assault. It also did not disclose that Childs had been demoted, or that before his demotion or the

issuance of the Collins Report, his supervisor had reprimanded him for his use of force on a restrained inmate. Respondents also included in the motion a block quote from Childs's incident report that describes Heath "kicking at the dog" and "interfer[ing] with the normal operations of the facility," without clarifying that Collins had discredited these very assertions.

The motion in limine also cast considerable doubt on the Collins Report's conclusions, echoing Roth's earlier assessment. It declared that the government was "*not conceding* that Officer Childs in fact made a false and/or misleading statement." It also contended that "even assuming *arguendo* that Officer Childs made a false and[/]or misleading statement into an Internal Affairs investigation, that 'bad act' does not 'bear[] directly upon' his veracity" with respect to the *Vaughn* trial. Yet more, the motion stated that "[t]he conclusion that Officer Childs made a false or misleading statement is at odds with the body of the report and does not appear evident from the text of Officer Childs'[s incident report]."

This commentary was seriously misleading. The Collins Report unequivocally states that Childs filed two false or misleading reports, and the "body of the [Collins] [R]eport" supports those conclusions. In the most generous possible framing, Childs's incident report was unclear about whether Heath was restrained at the time Childs sprayed him. But the incident report also says that Heath was

behaving in a "violent" and "disruptive" manner, something the Collins Report found to be untrue. Respondents also omitted Collins's conclusion that Childs falsely charged Heath with assault. And the motion did not explain how Childs's alleged misrepresentations would not "'bear[] directly upon' [Childs's] veracity" in the *Vaughn* trial.

Respondents also filed an ex parte motion to keep the Collins Report under seal. This motion expressed the government's belief that it was unnecessary to disclose the actual Collins Report to the defense, because the "essential facts" of the report were "related in the Background section of the Government's Motion in Limine." Based on the record, this was not correct.[4]

Making matters worse, the disclosure of the Collins Report itself did not go as planned. Dobbie attempted to fax it to the court but, due to a faxing error, sent only the first five pages. The information respondents omitted from the motion in

---

[4] Before the Hearing Committee, respondents offered several explanations for these drafting decisions. Dobbie, the motion's primary author, explained that she started with the Collins Report's Findings section and worked backward, for the most part including in the motion only the facts related to the formal findings. She also testified that she did not think that the government had any obligation to disclose the fact that Childs had submitted a false disciplinary report. And although she recognized that Childs's demotion should have been disclosed, she claimed to have forgotten about this fact when drafting the motion. Taylor, for her part, said that she was aware that both the Collins Report's conclusion about Childs's disciplinary report and his demotion were *Brady* material, but she largely failed to explain why these facts were left out of respondents' filings.

limine (about Childs's false disciplinary report and reprimand for using force) began on the sixth page.

### C.     Use of the Collins Report and its Consequences

The defense requested the Collins Report before trial, but the government opposed.  During the hearing on this request, the trial court asked respondents whether Childs had been "put on any probationary status" because of the incident with Heath.  Dobbie replied that Childs had been demoted and she expected him to testify that "he was demoted related to this incident, but not as to the particulars."

In that same hearing, the court pressed respondents about why the government could not simply provide the Collins Report to the defense subject to a protective order.  Dobbie answered that "the government doesn't believe that there is anything in the report that wasn't disclosed in the motion [in limine] that would be necessary for the defense counselors for the purposes that the Court has allowed the questioning."  But in the same conversation, she also asked the court whether any further disclosures were necessary:

> The government does not agree that it[']s required to turn over the final report.  I've made representations in the motion, and the Court has the final report, to be clear.  And if the Court finds that there's anything in the final report that should additionally be disclosed to defense counsel, if there's anything that I didn't include that would be

> useful—and I also want to make clear that the government is requesting that—I understand the Court's ruling that the defense counsel are permitted to ask about the—this event.

The court ultimately ruled that the defense could cross-examine Childs about his false incident report but denied the defense's request for the Collins Report itself.

After Childs testified at trial, the trial judge asked respondents whether they had provided the entire Collins Report, noting that the version he had been given was only five pages long. Dobbie had only brought to court a copy of what she had faxed—that is, an incomplete version of the report—and after consulting it, affirmed that her copy was also only five pages. She did so despite the fact that the Findings section on which she purportedly had relied while drafting the motion in limine began on page nine and thus was not part of the copy she consulted. Although Taylor had a complete copy of the report with her, she did not consult it or attempt to supplement Dobbie's response to the court's question.

The jury convicted both Morton and Vaughn of aggravated assault and assault on a law enforcement officer. In post-trial litigation, the court ordered the full Collins Report disclosed to the defense, at which point it became apparent that the court had previously received only a partial copy. Morton moved for a judgment of acquittal or a new trial because the government had not fulfilled its *Brady* obligations. Morton pointed out, among other things, that the government's motion

in limine never disclosed that Officer Childs had submitted a false disciplinary report. The trial court denied the motion and sentenced both Vaughn and Morton to over 60 months in prison. On appeal, this court reversed Morton's convictions specifically because of the government's *Brady* violations. *Vaughn*, 93 A.3d at 1266. The government did not retry Morton.

Because we concluded in *Vaughn* that respondents had failed to disclose exculpatory information to the defense, the Office of Disciplinary Counsel charged them with violating Rule 3.8(e). It also charged them with a violation of Rule 3.4(d), which makes it professional misconduct to "fail to make reasonably diligent efforts to comply with a legally proper discovery request by an opposing party," as well as violations of Rules 8.4(c), and 8.4(d).[5] The Hearing Committee concluded that respondents had violated all four rules and recommended a 30-day suspension. The Board agreed except as to Rule 3.4(d). But despite finding fewer violations than did the Hearing Committee, the Board recommended a suspension of six months.

---

[5] Disciplinary Counsel additionally charged respondents with violating Rule 3.3(a)(1), which prohibits knowingly making false statements of fact to a tribunal or failing to correct such statements, and Rule 3.3(a)(4), which forbids a lawyer from offering evidence that she knows to be false. These charges relate to Childs's trial testimony and are not relevant to this appeal.

## II.  Standard of Review

Disciplinary Counsel bears the burden of proving attorney violations of the Rules of Professional Conduct by clear and convincing evidence.  *In re Anderson*, 778 A.2d 330, 335 (D.C. 2001).  The Board reviews the Hearing Committee's legal conclusions de novo and accepts its factual findings if they are supported by substantial evidence.  *In re Martin*, 67 A.3d 1032, 1039 (D.C. 2013).  We in turn review the Board's legal conclusions de novo and factual findings for substantial evidence.  *In re Kline*, 113 A.3d 202, 206 (D.C. 2015).

The Board's recommended sanction "comes to us with a strong presumption in favor of its imposition."  *In re McClure*, 144 A.3d 570, 572 (D.C. 2016) (per curiam) (quoting *In re Baber*, 106 A.3d 1072, 1076 (D.C. 2015)).  We "shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted."  D.C. Bar R. XI, § 9(h)(1).

## III.  Disciplinary Violations

### A.  Rule 3.8(e)

The Board concluded that respondents violated Rule 3.8(e) by failing to disclose to the defense both that Childs had filed a false disciplinary report charging

Heath with assault and that Childs was demoted. We agree as to the former but not the latter.

### 1. Rule 3.8(e)'s State-of-Mind Requirements

Rule 3.8(e) reads in relevant part:

> The prosecutor in a criminal case shall not . . . . [i]ntentionally fail to disclose to the defense, upon request and at a time when use by the defense is reasonably feasible, any evidence or information that the prosecutor knows or reasonably should know tends to negate the guilt of the accused or to mitigate the offense . . . except when the prosecutor is relieved of this responsibility by a protective order of the tribunal.

A Rule 3.8(e) violation thus requires the following: (1) there must be evidence or information that tends to negate the guilt of the accused or mitigate the offense—call it exculpatory information; (2) the prosecutor must be aware of this information and either know that it is exculpatory, or the information must be such that a reasonable prosecutor would know that it is exculpatory; and (3) the prosecutor must intentionally fail to disclose this information to the defense upon request.

The parties and their amici devote considerable briefing to Rule 3.8(e)'s state-of-mind requirement, and we address it at the outset. Properly understood, Rule 3.8(e) has two such requirements, and our interpretation of the rule must give effect to both. *See Corley v. United States*, 556 U.S. 303, 314 (2009). The first is

"intentionally," and it modifies the action (or more likely inaction) element of the rule: a failure to disclose information to the defense. "Intentionally" is an adverb that means "on purpose." *Oxford English Dictionary* 1080 (2d ed. 1991); *Black's Law Dictionary* 810 (6th ed. 1990) (explaining that a person acts "intentionally" only if he "desires to cause [the] consequences of his act or he believes [those] consequences are substantially certain to result"). Consistent with these dictionary definitions, we have explained that "'intentional' requires an element of purposefulness or deliberateness or, at a minimum, of aggravated neglect." *In re Kline*, 113 A.3d at 213. So, to violate the rule, a prosecutor must act or fail to act with the purpose that information not be disclosed.

Rule 3.8(e)'s second state-of-mind requirement is knowledge or an unreasonable lack of knowledge. This mental state applies to the nature of the information that the prosecutor intentionally fails to disclose. It contemplates two situations, either of which suffices for a violation. In the first, the prosecutor knows that the information she intentionally failed to disclose is exculpatory. In the second, the prosecutor does not know that the information she intentionally failed to disclose is exculpatory, but this absence of knowledge is unreasonable. Rule 3.8(e) cannot be read to exclude either scenario. It uses the disjunctive—"knows *or* reasonably should know"—meaning that it contemplates either of two mutually exclusive possibilities: knowledge, or a lack of knowledge that is not reasonable.

The way these two states of mind interact in the Rule 3.8(e) context is not always straightforward, but consider the following examples. In the first example, a prosecutor is aware of two pieces of information, both of which he knows are exculpatory. He decides to disclose both of them to the defense and attempts to do so. But, because of a genuine accident on his part, he fails to attach one of the pieces of information to his submission and thus the defense never receives it. This prosecutor has not violated Rule 3.8(e) because his failure of disclosure was not intentional. It was not his purpose or objective to withhold the second piece of information. To the contrary, his goal was to disclose it, but because of an accident, he failed to do so.

In the second example, a prosecutor is aware of two pieces of information, one of which is objectively exculpatory and one of which is not. She decides to disclose only the second, non-exculpatory piece of information to the defense, and she does just that. In this situation, the prosecutor has intentionally failed to disclose exculpatory information to the defense. Her purpose and objective was to not disclose the first piece of information, and she accomplished that objective. Has that prosecutor violated Rule 3.8(e)? It depends. If, at the time she intentionally failed to disclose the first piece of information, she knew that it was exculpatory, the answer is yes. If instead she did not know that the information was exculpatory, but a reasonable prosecutor would have known that it was, the answer is also yes. In

that scenario, the prosecutor has intentionally failed to disclose information to the defense that the prosecutor reasonably should have known was exculpatory. But if the prosecutor did not know that the first piece of information was exculpatory, and a reasonable prosecutor also would not have known that the information was exculpatory, the answer is no. She did not have the requisite state of mind with respect to the nature of the information she intentionally failed to disclose.

This is how the court interpreted Rule 3.8(e)'s state-of-mind requirements in *In re Kline*, our only prior case on this issue. Kline was a prosecutor who failed to disclose a piece of exculpatory information to the defense because he "did not believe he had an obligation to turn it over." 113 A.3d at 206. We held that he had violated Rule 3.8(e). *Id.* at 213-14. Kline had acted intentionally, we explained, because his failure to disclose the information "was a purposeful or deliberate act" and the product of a "conscious[] deci[sion]." *Id.* Kline's conscious, purposeful inaction was sufficient for a Rule 3.8(e) violation. We could hardly have been clearer on this point, stating at the end of our analysis that "the evidence is such that it produces in the mind of the trier of fact a 'firm belief' that Kline intentionally withheld the statement *because he did not think it was exculpatory*." *Id.* at 214 (emphasis added).

Respondents and their amici resist this understanding of Rule 3.8(e)'s state-of-mind requirements. Although they use varying terminology, their positions amount to the same thing: to violate Rule 3.8(e), a prosecutor must act or fail to act with the purpose to deprive the defense of exculpatory information. Put another way, the prosecutor must intend the forbidden result, so her intentionality must extend not only to the nondisclosure, but also to the nature of the information.

To reach this result, respondents focus on the word "intentionally." They begin where we do, with the word's ordinary meaning. To act intentionally, they correctly explain, is to act "on purpose; with conscious intent." But they break with us regarding exactly what must be done on purpose. In their view, a prosecutor must not just fail to disclose information on purpose; she must fail to do what Rule 3.8(e) requires her to do on purpose.

The primary problem with this reading of Rule 3.8(e) is that it fails to account for the phrase "reasonably should know." To reiterate, Rule 3.8(e) holds a prosecutor liable for intentionally failing to disclose information she "knows or reasonably should know" is exculpatory. This means that a prosecutor can violate Rule 3.8(e) if she intentionally fails to disclose information she *does not know* is exculpatory, so long as this belief is not reasonable. But that result, dictated by the plain text of Rule 3.8(e), cannot be reconciled with how respondents would read the

rule, because in that situation the prosecutor has not violated her disclosure obligations *intentionally*. Because she did not know that the information she intentionally withheld was information she was required to disclose, her purpose was not to shirk the rule. In other words, her intentionality did not extend to the nature of the information. Put another way, respondents' interpretation would make it impossible for prosecutors to violate the rule accidentally, but unreasonably.

"It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)). The same is true for rules of professional conduct. *See In re Greenspan*, 910 A.2d 324, 335-36 (D.C. 2006). For respondents' reading of Rule 3.8(e) to prevail, they must offer an interpretation of "reasonably should know" that is at least as compelling as the common-sense one offered above.

Their effort to do so falls short. Respondents submit that "reasonably should know" simply indicates that whether information is exculpatory or not should be evaluated based on what is known at the time of trial, not what is known retrospectively during the adjudication of a Rule 3.8(e) charge. That may be true, but it is unclear how this serves respondents. In theory, if a piece of information's

exculpatory nature was not reasonably apparent or knowable at the time it is withheld, then a prosecutor cannot be said to have violated the rule. But here, the withheld information was clearly exculpatory, and its exculpatory value existed before, during, and after it was withheld.

Nor can we square respondents' preferred construction of Rule 3.8(e) with *In re Kline*. Recall that Kline was held liable under Rule 3.8(e) for not disclosing exculpatory information that he did not believe he needed to disclose. 113 A.3d at 214. Because we concluded that Kline was simply mistaken as to the evidentiary significance of the information at issue, we necessarily did not conclude—and could not have concluded—that he had acted in bad faith or with a purpose to achieve a wrongful result. *Id.* That is to say, Kline did not think he was violating his disclosure obligations, so he did not intentionally violate them. *Id.* But he was held to have violated Rule 3.8(e) nevertheless.

Respondents' efforts to recast *In re Kline* are not persuasive. They argue that the court inferred from Kline's pervasive pattern of nondisclosure that he acted with the intention to violate Rule 3.8(e). Their amici further suggest that the court in *In re Kline* imposed a "bad faith" requirement. Neither contention is correct. The court

in fact said that "Kline consciously decided that [the information] did not have to be produced and thus acted with 'deliberateness.'" 113 A.3d at 214.[6]

Finding little support in text or precedent, respondents and their amici devote much of their briefing to legislative history. Even if the legislative history strongly favored respondents' position, it would not matter, because legislative history cannot override unambiguous language and binding precedent. *Hood v. United States*, 28 A.3d 553, 559 (D.C. 2011) ("The primacy of the statutory text means that resort to legislative history to construe a statute is generally unnecessary (if not, indeed, disfavored); usually it is appropriate only to resolve a genuine ambiguity or a claim that the 'plain meaning' leads to a result that would be absurd, unreasonable, or contrary to the clear purpose of the legislation."). But the legislative history on which respondents rely has little to offer. To support their understanding of "intentionally," respondents cite to a 1986 joint report from the D.C. Bar's Model

---

[6] Respondents and their amici also cite two concurrences in *Miller v. United States*, 14 A.3d 1094 (D.C. 2011), for support, but these separate writings add little to our analysis. It is true that Judge Ruiz's solo concurrence suggests in passing that a violation of Rule 3.8(e) requires bad faith. *Id.* at 1134-35 n.1 (Ruiz, J., concurring). But a solo concurrence is just that—a solo concurrence. And even if Judge Ruiz's solo concurrence was a majority opinion, her comment on Rule 3.8(e) would be dictum because *Miller* did not involve a Rule 3.8(e) charge, only a *Brady* violation in the context of a direct criminal appeal. *Id.* at 1097. The U.S. Attorney's Office's appeal to Judge Schwelb's concurrence is also unconvincing because that opinion does not even purport to address the scope of liability under Rule 3.8(e). *Id.* at 1135 (Schwelb, J., concurring).

Rules of Professional Conduct Committee (the "Jordan Committee") and the D.C. Bar Board of Governors, which made recommendations to this court regarding the Rules of Professional Conduct, and the various materials on which the drafters of that report relied in making their recommendations. *See Proposed Rules of Professional Conduct and Related Comments, Showing the Language Proposed by the American Bar Association, Changes Recommended by the District of Columbia Bar Model Rules of Professional Conduct Committee, and Changes Recommended by the Board of Governors of the District of Columbia Bar* ("Jordan Report") 171-76 (1986). The recommendations contained in this report provided the foundation for the District's current rules. Respondents explain that when writing Rule 3.8(e), the drafters drew from several other similar rules, and only one of these, Standard 3-3.11(a) of the ABA Standards for Criminal Justice, includes the word "intentionally." Jordan Report, *supra*, at 175; ABA Standards for Criminal Justice, The Prosecution Function, Standard 3-3.11(a) (Am. Bar Ass'n 2d ed. 1980). Other ABA materials in turn define the mental state of "intent" as "when the lawyer acts with the conscious object or purpose to accomplish a particular result." ABA Standards for Imposing Lawyers Sanctions § II (Am. Bar. Ass'n 1986). Thus, respondents conclude, the drafters of Rule 3.8(e) sought to incorporate this ABA definition and therefore to give "intentionally" its ordinary meaning: on purpose.

We take no issue with any of that, but we also do not find it particularly probative of the answer to the critical question: *what* must be done on purpose? On that score, respondents' argument boils down to the somewhat circular contention that because the drafters of the report included the word "intentionally," it must bear the meaning respondents ascribe to it—a violation, not just a failure to disclose information, must be intentional. But as we have already explained, the answer to that question must be such that "reasonably should know" also has a reasonable meaning. And the legislative history respondents offer in support of their interpretation of "reasonably should know" is unpersuasive.

Respondents insist that a set of notes summarizing the discussion in a meeting of the D.C. Bar's Board of Governors regarding the proposed Rule 3.8(e) demonstrates that "reasonably should know" addresses issues of temporality. D.C. Bar Board of Governors, Minutes of March 11, 1986, Attachment D (Notes Summarizing the Board's Discussion of Rule 3.8) ("Board of Governors' Notes"). But they candidly do "not pretend . . . that it is crystal-clear from the Board of Governors' Notes that this is what the Board was trying to achieve with the addition of 'knows or reasonably should know.'" These notes indicate that a single Board member, Charles F.C. Ruff, was concerned about the retrospective vantage point from which prosecutors' actions would be evaluated in disciplinary proceedings. Board of Governors' Notes, *supra*, at 4-5. And they show that certain Board

members, including Ruff, endorsed adding "knows or reasonably should know" to the rule. *Id.* at 2. But the notes provide no indication that this linguistic change was related to the separate concern about temporality. *Id.* at 2, 4-5. The discussions are distinct, and no member proposed adding "reasonably should know" as a way to prevent prosecutors from being judged unfairly in hindsight. That is unsurprising, because inserting "reasonably should know" would be a confusing and counterintuitive way to accomplish that result.

In the excerpt from the notes most helpful to respondents, Ruff notes that "the Subcommittee [on Rules for Prosecutors of the D.C. Bar Model Rules of Professional Conduct Committee] was in agreement that [what is now Rule 3.8(e)] should express the concept that a prosecutor knew or reasonably should have known that he was in violation of his obligation to disclose mitigating information." *Id.* at 2. Even if we read this statement as favoring respondents' proffered interpretation of Rule 3.8(e), it has little persuasive value. It is a note describing the way a single Board member understood the sense of a subcommittee, and third-hand synopsis cannot make the text of a rule mean something it does not say. This also points to a larger problem: even if the subcommittee wanted to "express the concept" that a violation of Rule 3.8(e) must be intentional—something it easily could have done— that is not the concept expressed by the words comprising Rule 3.8(e). Simply put, legislative history and speculation about the desires of those who contributed to a

text cannot override the clear language of that text. In any event, this excerpt is unconnected to any discussion of *when* a prosecutor must be aware that information is exculpatory. It is a separate comment about a separate issue. In short, nothing in the legislative history causes us to second-guess our reading of the rule's text and our precedent.[7]

Respondents' appeals to public policy and those of their amici are likewise unavailing. They first contend that it is simply unfair to discipline prosecutors who have not acted in bad faith. But standards of reasonableness—standards that do not require bad faith—pervade the Rules of Professional Conduct.[8] And we routinely

---

[7] Still another excerpt of the notes states that Ruff "observed that what the Jordan Committee was trying to do was to step back from *Brady* and simply state that, where the prosecutor knowingly failed to meet some minimum standard of disclosure, he had committed an ethical violation." Board of Governors' Notes, *supra*, at 4. We find this third-hand statement even less probative than the others we have discussed, because Ruff refers to a state of mind—knowingly—found nowhere in Rule 3.8(e).

[8] *See, e.g.*, D.C. R. Pro. Conduct 2.3(b) ("When the lawyer *knows or reasonably should know* that [an] evaluation [of a matter affecting a client provided for the use of someone other than the client] is likely to affect the client's interests materially and adversely, the lawyer shall not provide the evaluation unless the client gives informed consent." (emphasis added)); *id.* Rule 2.4(b) ("A lawyer serving as a third-party neutral shall inform unrepresented parties that the lawyer is not representing them. When the lawyer *knows or reasonably should know* that a party does not understand the lawyer's role in the matter, the lawyer shall explain the difference between the lawyer's role as a third-party neutral and a lawyer's role as one who represents a client." (emphasis added)); *id.* Rule 3.4(a) ("A lawyer shall not . . . [o]bstruct another party's access to evidence or alter, destroy, or conceal

affirm serious penalties for behavior without requiring a showing of bad faith. To take just one example, this court has often meted out lengthy suspensions to attorneys who negligently comingled or misappropriated client funds.[9] We see no reason why prosecutors, who wield tremendous power and exercise broad discretion over the lives of others, should not be held to a similar standard. We would also be remiss to overlook the manifest unfairness in the other direction: *Brady* violations can cause innocent people to lose their liberty, whether those violations were committed merely unreasonably or instead with ill intent. Rule 3.8(e) quite properly

---

evidence, or counsel or assist another person to do so, if the lawyer *reasonably should know* that the evidence is or may be the subject of discovery or subpoena in any pending or imminent proceeding." (emphasis added)); *id.* Rule 3.6 ("A lawyer engaged in a case being tried to a judge or jury shall not make an extrajudicial statement that the lawyer *knows or reasonably should know* will be disseminated by means of mass public communication and will create a serious and imminent threat of material prejudice to the proceeding." (emphasis added)).

[9] *See, e.g.*, *In re Robinson*, 74 A.3d 688, 697-98 (D.C. 2013) (noting that "[a] six-month suspension is the norm as a starting point for negligent misappropriation cases" and suspending an attorney for seven months for negligent misappropriation of client funds); *In re Herbst*, 931 A.2d 1016, 1017 (D.C. 2007) ("[A] six-month suspension is the norm for attorneys who have negligently misappropriated client funds."); *In re Davenport*, 794 A.2d 602, 605 (D.C. 2002) (suspending an attorney for six months for negligent misappropriation of client funds); *In re Anderson*, 778 A.2d 330, 342 (D.C. 2001) (same); *In re Chang*, 694 A.2d 877, 878 (D.C. 1997) (same); *In re Reed*, 679 A.2d 506, 509 (D.C. 1996) (same); *In re Evans*, 578 A.2d 1141, 1143 (D.C. 1990) (same); *In re Hessler*, 549 A.2d 700, 703 (D.C. 1988) (same).

imposes discipline in both circumstances.[10]  Finally, we note that the District's rule is *more* lenient with prosecutors than the comparable rules of nearly every other state, which at least by their terms do not apply an elevated standard of culpability like "intentionally" to any component of a prosecutor's failure to disclose exculpatory information.[11]

---

[10] We use "*Brady* violations" here as a shorthand, and we do not mean to imply that all Rule 3.8(e) violations are *Brady* violations, or vice versa.  As we explained in *In re Kline*, that is not the case.  113 A.3d at 209-11.

[11] *See, e.g.*, Alaska R. Pro. Conduct 3.8(d); Ariz. R. Pro. Conduct 3.8(d); Ark. R. Pro. Conduct 3.8(d); Cal. R. Pro. Conduct 3.8(d); Colo. R. Pro. Conduct 3.8(d); Conn. R. Pro. Conduct 3.8(d); Del. R. Pro. Conduct 3.8(d)(1); Fla. R. Pro. Conduct 4-3.8(c); Ga. R. Pro. Conduct 3.8(d); Haw. R. Pro. Conduct 3.8(b); Idaho R. Pro. Conduct 3.8(d); Ill. R. Pro. Conduct 3.8(d); Ind. R. Pro. Conduct 3.8(d); Iowa R. Pro. Conduct 32:3.8(d); Kan. R. Pro. Conduct 3.8(d); Ky. R. Sup. Ct. 3.130(3.8(c)); La. R. Pro. Conduct 3.8(d); Me. R. Pro. Conduct 3.8(b); Md. R. Att'ys R 19-303.8(d); Mass. R. Pro. Conduct 3.8(d); Mich. R. Pro. Conduct 3.8(d); Minn. R. Pro. Conduct 3.8(d); Miss. R. Pro. Conduct 3.8(d); Mo. R. Pro. Conduct 4-3.8(d); Mont. R. Pro. Conduct 3.8(d); Neb. Ct. R. Pro. Conduct § 3-503.8(d); Nev. R. Pro. Conduct 3.8(d); N.H. R. Pro. Conduct 3.8(d); N.J. R. Pro. Conduct 3.8(d); N.M. R. Pro. Conduct 16-308(D); N.Y. R. Pro. Conduct 3.8(b); N.C. R. Pro. Conduct 3.8(d); N.D. R. Pro. Conduct 3.8(d); Ohio R. Pro. Conduct 3.8(d); Okla. R. Pro. Conduct 3.8(d); Or. R. Pro. Conduct 3.8(b); Pa. R. Pro. Conduct 3.8(d); R.I. R. Pro. Conduct 3.8(d); S.C. R. Pro. Conduct 3.8(d); S.D. R. Pro. Conduct 3.8(d); Tenn. R. Pro. Conduct 3.8(d); Tex. R. Pro. Conduct 3.09(d); Utah R. Pro. Conduct 3.8(d); Vt. R. Pro. Conduct 3.8(d); Va. R. Pro. Conduct 3.8(d); Wash. R. Pro. Conduct 3.8(d); W. Va. R. Pro. Conduct 3.8(d); Wis. R. Pro. Conduct 20:3.8(f); Wyo. R. Pro. Conduct 3.8(d).  Almost every jurisdiction besides the District phrases its rule as a command—"[a] prosecutor shall make timely disclosure"—rather than a prohibition.  Nevertheless, the rules of these other jurisdictions do not on their face give any indication of a culpability requirement besides that a prosecutor have knowledge of the information that she does not timely disclose.

Respondents' amici also argue that only bad-faith *Brady* violations can be deterred through professional misconduct sanctions, so penalizing non-bad-faith violations accomplishes nothing in practice. We reject that proposition. The specter of discipline can and should motivate prosecutors' offices to institute the kind of training, review, and procedural safeguards that make such violations less likely. Finally, respondents' amici insist that the level of disclosure required by our reading of Rule 3.8(e) would put witnesses at risk. But they have given us no reason to believe that devices like protective orders will be inadequate to address such concerns in almost every case.

## 2. Rule 3.8(e): The Collins Report

Having explained Rule 3.8(e)'s requirements, we now apply them. No one disputes before this court that the Collins Report contained information that "tend[ed] to negate the guilt of the accused" in the *Vaughn* prosecution. While the duties Rule 3.8(e) imposes on prosecutors are not in every respect identical to those the Constitution does under *Brady* and its progeny, *see In re Kline*, 113 A.3d at 209-11, we agree with the Hearing Committee and the Board that the two overlap here. In *Giglio v. United States*, 405 U.S. 150 (1972), the Supreme Court held that, under *Brady*, prosecutors must disclose to the defense material information that

impeaches the prosecution's witnesses. *Id.* at 153-54. Rule 3.8(e) incorporates that principle, absent the materiality requirement.

We can think of few things more powerfully impeaching of Childs—whose task was to tell the jury that certain D.C. Jail inmates had committed assault—than that he had previously falsely accused an inmate of assault. So too that he had violated DOC's use-of-force policies, filed a false incident report after the fact, and been disciplined for his use of force. This last piece of information is important because DOC demoted Childs after he was reprimanded for his unauthorized use of force. While the record is murky about the exact reason for this demotion, that Childs was previously reprimanded for his use of force at least allows the inference that he was demoted for some additional infraction—namely, his untruthful reporting. Indeed, we made this very inference in *Vaughn*. *See* 93 A.3d at 1255. The ability to make this inference, of course, would have been useful to the defense.

Respondents' conduct also satisfies both of Rule 3.8(e)'s state-of-mind requirements. A reasonable prosecutor would have known that the information just described was *Giglio* information. *Vaughn*, 93 A.3d at 1266 ("[W]hether the government had an obligation to accurately and completely disclose the contents of the [Collins Report] and the DOC's consequent decision to demote Officer Childs should not have been a hard call for the government."). Respondents make no

argument to the contrary, and Taylor testified that she knew all of this material needed to be disclosed.

Respondents also intentionally failed to disclose some (but not all) of this information to the defense. The motion in limine they filed—the only disclosure of the Collins Report's substance they made available to the defense—did not disclose that Childs had submitted a false disciplinary report wrongfully accusing an inmate of assault. And it did not disclose that he had been reprimanded for improperly using force on an inmate. Crafting the motion that way was the product of a conscious decision and an intentional act on respondents' part. As the Board put it: "Respondents disclosed everything they intended to," because they "included everything in the motion in limine that they intended to include." Much like the prosecutor in *In re Kline*, respondents "consciously decided" not to include certain portions of the Collins Report in their motion "and thus acted with deliberateness." 113 A.3d at 214 (internal quotation marks omitted). Nothing more is required.

All of that, though, does not quite settle the issue. There is a further question whether, despite the defects with the motion in limine, respondents nevertheless adequately disclosed the exculpatory information from the Collins Report by submitting (part of) the report to the court and asking during trial whether any additional disclosure was necessary. It is undisputed that it was relatively common

at that time for prosecutors who had *Brady* questions to submit evidence to the court and ask whether it needed to be provided to the defense. And both the Hearing Committee and the Board declined to find a Rule 3.8(e) violation based solely on respondents' decision to disclose the Collins Report to the court instead of directly to the defendants.

We agree, in the abstract, that in certain circumstances it may be unfair to penalize prosecutors for following a practice that was accepted and apparently approved by the courts. In theory, if respondents had submitted a clear request for *Brady* guidance to the trial court, and if the trial court had subsequently held disclosure to be unnecessary, we might be less inclined to find a Rule 3.8(e) violation. But that is not what respondents did. Begin with the fact that neither the motion in limine nor the ex parte motion even mentions *Brady* or any case in the *Brady* line. Nor does either motion ask the court to identify any information not summarized therein that should be disclosed. To the contrary, the ex parte motion says: "The government does not believe that disclosure of the Final Report is necessary for resolution of the Government's Motion in Limine. *The essential facts are related in the Background section of the Government's Motion in Limine.*" The argument section of the motion in limine is also devoted to explaining why the contents of the Collins Report should be excluded from the scope of cross-examination. It strains credulity to suggest that these motions were actually,

despite all appearances, meant to put the court on notice that respondents wanted to make sure their disclosures were sufficient.

But there is more. The motion in limine casts groundless aspersions on the Collins Report's conclusions, which surely counts against the argument that the motion was a straightforward request for *Brady* guidance. It is important to remember that at the time respondents wrote this motion, they had not viewed any of the underlying evidence on which the Collins Report was based, so they had no basis to doubt whether Collins's conclusions were reasonable or not. But that unfortunately proved no barrier to their disputing those conclusions. Respondents wrote that "[t]he government is *not conceding* that Officer Childs in fact made a false and/or misleading statement," despite the report's identification of three such statements made in two separate reports.[12] Respondents also said that "[t]he conclusion that Officer Childs made a false or misleading statement is at odds with the body of the report." We cannot identify any reasonable justification for that statement. If anything, respondents sought to downplay the potential *Giglio* significance of even the aspects of the Collins Report that they disclosed, arguing that the finding that Childs filed a false incident report did not "'bear[] directly upon'

---

[12] These false statements are the false assault charge, the statement that Heath was acting violently, and the strong implication that Heath was not restrained when Childs sprayed him with a chemical agent.

his veracity with respect to this trial." This was hardly a reliable means of flagging to the trial judge that there may have been more *Brady* material for him to consider asking the government to release.

Respondents are nevertheless correct that the evidence is not one-sided. Starting with the motions themselves, a footnote in the motion in limine states that the Collins Report contains "sensitive employment information" and requests that the court "review the report *in camera* prior to disclosing it to defense counsel." The ex parte motion similarly says that "[e]ven if the court determines that defense counsel is entitled to the Final Report or a portion of the Report, the government requests that this disclosure be made via discovery letter." These passages suggest that respondents at least contemplated that the court would review the report and might order it disclosed to the defense. But these asides do not count for much. For one, neither passage says anything about reviewing the adequacy of the government's *Brady* disclosures. For another, both statements aim to keep the report away from the defense and specify procedures to be followed if the court ultimately disagrees with the government's arguments. Their goal is clearly to limit disclosure to the greatest extent possible.

More significant are two statements that Dobbie made during trial, one shortly after the other. As mentioned earlier, when arguing to the court that the government was not obligated to share the Collins Report with the defense, Dobbie stated:

> The government does not agree that it[']s required to turn over the final report. I've made representations in the motion, and the Court has the final report, to be clear. And if the Court finds that there's anything in the final report that should additionally be disclosed to defense counsel, if there's anything that I didn't include that would be useful—and I also want to make clear that the government is requesting that—I understand the Court's ruling that the defense counsel are permitted to ask about the—this event.

Dobbie then reiterated her position that the government had disclosed everything it was obligated to: "[T]he government doesn't believe that there is anything in the report that wasn't disclosed in the motion that would be necessary for the defense counselors for the purposes that the Court has allowed the questioning."

The first statement contains what is absent from the motions: a request for guidance about whether the government needed to turn additional information over to the defense. The second statement somewhat undercuts the first, although there is nothing inconsistent about Dobbie (1) believing that respondents had disclosed everything they were obligated to but also (2) asking the court whether more was necessary.

While we credit Dobbie's belated effort to ask the court whether further disclosures were necessary, we do not think it obviates respondents' Rule 3.8(e) violation. Too much went wrong for that. As a refresher, respondents (1) filed a misleading and factually incomplete motion to exclude evidence; (2) incorrectly represented that the body of that motion contained all necessary disclosures; (3) succeeded in getting the evidence excluded, likely in part because of their misrepresentations; and (4) inadvertently failed to share the underlying evidence with the court, and at the very least negligently failed to accurately and adequately respond to the court's question about whether it had all such evidence. Rule 3.8(e) cannot abide that course of conduct, even if Dobbie eventually asked in passing whether the government needed to disclose additional information. One brief remark cannot turn respondents' misleading and ultimately successful effort to exclude evidence into good-faith compliance with their disclosure obligations.

Respondents make much of the fact that they attempted to share the entire Collins Report with the trial court and were stymied by what appears to have been an uncooperative fax machine. But we do not think that Dobbie's faxing mishap makes much difference to the disposition of the Rule 3.8(e) charge. Because the record indicates that Dobbie's failure to fax the full report was a genuine accident, let us pretend for the purpose of analysis that no such accident occurred and that Dobbie *did* manage to fax the entire Collins Report at the appropriate time. That

does not convert respondents' motion in limine into a request for *Brady* guidance, make up for the fact that its summary of the relevant facts was incomplete despite respondents' repeated assurances to the contrary, or erase the misleading gloss respondents put on the Collins Report's conclusions. It is of course possible that everything else notwithstanding, the trial court could have taken it upon itself to scrub the Collins Report, compare it to the motion in limine, identify the *Brady* material that had been withheld, and order that material disclosed at an early enough time to be useful to the defense. But this counterfactual is speculative and unlikely, even assuming that the trial court had the full report. We might view the situation differently if respondents had made a clear and timely request for *Brady* guidance. In that scenario, respondents' only real error may well have been a botched faxing job. But that scenario is not this one. Here, respondents' errors were substantive and numerous. And here, supposition about how the trial court could have bailed respondents out if equipped with all of the information cannot be dispositive.

We are also unconvinced by respondents' assertion that, despite what the motion in limine said, the trial court understood it as a request for *Brady* guidance. In his testimony before the Hearing Committee, the trial judge, Judge Robert E. Morin, said that it was "not unusual for the government at that time to submit . . . materials that they wanted me to review and determine whether or not it should be turned over to the defense." But he did not say that is what happened here.

Instead, he said that the motion in limine "came up in a little different posture . . . in the sense that . . . it was an ex parte motion by the government to prevent cross-examination." Judge Morin made clear that he was "not trying to convey an opinion one way or the other," but also described the motion as "proactive" and "in line with what had happened before, in other cases." We think this testimony means what it says: Judge Morin correctly understood respondents' motion not as a request for *Brady* guidance but rather as a proactive motion to prevent cross-examination, a kind of motion the government had made in other cases. And even if it is not perfectly clear what Judge Morin intended to convey, we still do not think that the motion in limine can be treated as a request for *Brady* guidance. The best evidence of the motions' intended purposes comes from the motions themselves. At the risk of belaboring the point, neither had any indicia of a request for *Brady* guidance. They were efforts to keep information away from the defense and out of the trial. Speculation about what implicit understandings Judge Morin might or might not have had, but left unstated before the Hearing Committee, does not disturb this conclusion.

Finally, respondents argue that their conduct fell within Rule 3.8(e)'s safe harbor that exempts prosecutors from making disclosures they otherwise would be required to make if they are "relieved of this responsibility by a protective order of the tribunal." They contend that because they filed the Collins Report with the court

and the court denied the defense access to it, there was the equivalent of a protective order in place that relieved them of their obligation to disclose the contents of the report. It is debatable whether the trial court imposed some form of protective order. While the court did not order respondents to provide the Collins Report to the defense during trial, it did order the report disclosed after trial subject to an express protective order. So, the court knew how to impose a protective order in direct terms, and it did not do so during the trial.

But even if we accept that the court implicitly put in place a protective order for the duration of trial, we have no trouble concluding that it did not cover the *Brady* information that respondents had failed to disclose to the defense. Whatever protective order respondents obtained was obtained at least in part through omission or misrepresentation.[13] They claimed that the motion in limine contained all "essential facts" from the Collins Report. But they failed to disclose key conclusions from the report, most significantly that Childs had filed a false disciplinary report.

---

[13] We recognize that even when the trial court had all of the information before it post-trial, it affirmed its earlier rulings with respect to the Collins Report. *Vaughn*, 93 A.3d at 1253. But as we explained in *Vaughn*, when the entire record is considered from the outset, it becomes apparent that "the trial court was misled and that its adoptive fact-finding was clearly wrong." *Id.* at 1255. We thus agree with the suggestion in *Vaughn* that "[h]ad the defense and the court known the full details of the OIA's actual findings and of the discipline meted out by DOC as a result— and had the government known the defense knew—we think it likely that this case would have played out very differently." *Id.* at 1263.

They also cast doubt on and mischaracterized the findings they did disclose.  And they again inaccurately represented in court that they had disclosed all information to which the defense was entitled.  It was only *after* these actions that the trial court declined to let the defense access the report.

We therefore understand the trial court's actions as follows: because the defense had, so far as the trial court understood, received all the information to which it was entitled, the trial court simply allowed the prosecution to withhold the rest of the report—that is, information to which the defense had no entitlement.  In other words, because the trial court was acting on the understanding that all *Brady* disclosures had been made, to the extent it imposed a protective order, that order should be understood only to have covered non-*Brady* information.  By the same token, it should not be understood to have covered the *Brady* information that the government had not disclosed.  Respondents thus cannot avail themselves of the protective order safe harbor with respect to the exculpatory information they left out of the motion in limine.

Closing out this issue, we emphasize the following: respondents chose—albeit at the suggestion of their supervisor—not to follow the typical and advisable practice of disclosing *Brady* evidence to the defense directly.  While we question the wisdom of using the trial court as a *Brady* backstop, we do not hold that doing so inherently

breached Rule 3.8(e). But we do hold that pursuing this alternative course in the way respondents did was a violation of the rule. When prosecutors proceed in a manner inconsistent with Rule 3.8(e)'s text—when they do not disclose exculpatory information "to the defense"—they assume the risk that their alternative measures will be inadequate and that they will be held responsible for their actions.

### 3. Rule 3.8(e): Childs's Demotion

The Board concluded that, in addition to respondents' Rule 3.8(e) violation with respect to the contents of the Collins Report, they committed another, distinct Rule 3.8(e) violation by failing to disclose that Childs had been demoted. We disagree for the simple reason that respondents *did* disclose that Childs had been demoted. On the first day of trial, the court asked whether Childs had been "put on any probationary status," and Dobbie responded that he had been demoted and she expected him so to testify.

According to the Board, Dobbie's statement was inadequate, largely because it was unaccompanied by two additional disclosures: first, that Childs had filed a false disciplinary report, and second, that Childs had been separately reprimanded for his use of force through a Letter of Direction. As we have explained, this latter fact allows the inference that Childs was demoted for his false reporting. *See Vaughn*, 93 A.3d at 1255 & n.20. The Board reasoned that without this additional

context, Dobbie's disclosure of Childs's demotion was not meaningful in the *Brady* and *Giglio* sense because the significance of the demotion to Childs's credibility was not apparent.

That is all fair enough, but these important contextual facts were missing only because of respondents' inadequate disclosure of the Collins Report, not their inadequate disclosure of the fact that Childs had been demoted. Had the Collins Report or all of the material facts therein been provided to the defense, the defense would have been able to draw the same inferences Disciplinary Counsel, the Board, and the *Vaughn* court did—namely, that Childs was likely demoted for his dishonesty—and make use of those inferences at trial. It was thus respondents' failures related to the Collins Report that prevented their disclosure of Childs's demotion from being meaningful. Unlike the Board, we do not find two Rule 3.8(e) violations—one for inadequately disclosing the report and another for inadequately disclosing the demotion. We instead find one violation: the failure to disclose all *Brady* information in the Collins Report.[14]

---

[14] For this reason, we decline to pass on the Board's express factual finding that respondents knew that Childs had been demoted "because of the conclusions in the Collins Report, including the false disciplinary charge."

## B. Rule 8.4(c)

We agree with the Board that respondents violated Rule 8.4(c) by acting with reckless dishonesty, although we depart from the Board slightly as to the particulars. We note at the outset that while we by no means condone respondents' conduct, we consider it at the low end of culpability as far as Rule 8.4(c) misconduct goes. "[C]onduct involving dishonesty" is not a precise standard, but we must draw the line somewhere. We think a fair reading of our cases constrains us to hold that respondents crossed that line. But we do not think that respondents acted with the kind of malign intent often associated with those words. Rather, they were inexperienced, poorly supervised, and made serious mistakes that we have no reason to believe they will make again.

Rule 8.4(c) makes it professional misconduct for a lawyer to "[e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation." *Id.* "[D]ishonesty, fraud, deceit, and misrepresentation are four different violations, that may require different quantums of proof." *In re Romansky* ("*Romansky I*"), 825 A.2d 311, 315 (D.C. 2003). Dishonesty is the most capacious of the four, *id.*, and the only violation relevant here.

We have explained that sanctionable dishonesty "does not always depend on a finding of intent to defraud or deceive." *Id.* (quoting *In re Estate of Corriea*, 719

A.2d 1234, 1242 (D.C. 1998)). Conduct that demonstrates a "reckless disregard of the truth" can therefore sustain a charge of dishonesty, *In re Ukwu*, 926 A.2d 1106, 1113-14 (D.C. 2007), although mere negligence cannot, *see In re Romansky* ("*Romanksy II*"), 938 A.2d 733, 742 (D.C. 2007). Recklessness is a "state of mind in which a person does not care about the consequences of his or her action." *Id.* at 740 (quoting *Romansky I*, 825 A.2d at 316). "To show recklessness, Bar Counsel must prove by clear and convincing evidence that [an attorney] 'consciously disregarded the risk'" that her conduct was untruthful or that it would lead to a misapprehension of the truth. *Id.* (quoting *In re Anderson*, 778 A.2d at 339). Whether an attorney's conduct amounted to recklessness is a legal question, not a factual one, so this court reviews the Board's conclusion on the issue de novo. *Romansky II*, 938 A.2d at 739.

*Romansky II* governs our approach to analyzing reckless dishonesty in the Rule 8.4(c) context. In that case, a law firm partner overcharged several clients for the firm's services, using a billing methodology out of step with the engagement letters the firm had with those clients. 938 A.2d at 736-37. The firm had just transitioned to a new set of billing practices, and the firm's agreements with the clients in question reflected the prior policy. *Id.* at 736. It was apparent that the attorney had not overbilled his clients knowingly, but we still had to decide whether he had acted recklessly and therefore violated Rule 8.4(c). *Id.* at 740.

To answer this question, the court weighed the evidence for and against a finding of recklessness. In the former camp were the following facts: the attorney admitted that when he had billed the clients he had not consulted the relevant engagement letters or even considered whether the firm's old or new billing policy applied, despite his awareness of the recent policy change. *Id.* at 741. He was also responsible for a disproportionate number of billings at the firm, something that arguably should have put him on high alert about the need for diligence during a period of flux. *Id.* But several pieces of evidence cut the other way. The firm's recent change in policy made mistakes more likely, and the billings in question were sent out shortly after the firm adopted a new model engagement letter implementing the revised policy—something that could have led the attorney to assume that this new letter governed billings with the clients in question. *Id.* And in fact, two attorneys at the firm testified that these circumstances could have caused confusion as to what approach to take. *Id.* In addition, the attorney's responsibility for a large number of billings cut both ways: a mistake was simply more likely given his significant book of business. *Id.* Finding the evidence "virtually in equipoise," we could not "conclude . . . by the requisite 'clear and convincing' evidence that the [attorney] was reckless rather than negligent." *Id.* at 742. We therefore held that he had not violated Rule 8.4(c). *Id.*

Before applying *Romansky II* here, we must determine what specific conduct by respondents may have been dishonest. The Board identified respondents' failure to include in the motion in limine that Childs had falsely charged an inmate with assault. We can think of another, better candidate: respondents' mischaracterization of the Collins Report's conclusions in the motion in limine and related decision not to "conced[e]" that Officer Childs "had made a false and/or misleading statement."

We do not believe that there is clear and convincing evidence that respondents acted with reckless dishonesty by omitting from the motion in limine that Childs had falsely accused an inmate of assault. Dobbie testified that she did not think that this information needed to be disclosed, and the Hearing Committee and Board did not make an adverse credibility finding with respect to this testimony. Admittedly, it is hard to understand how she could have thought that. And if this were the only evidence before us, we would be hard-pressed to conclude that she had not been reckless. But there is other evidence we must consider as well. Respondents attempted—unsuccessfully, as it turned out—to fax the entire Collins Report to the trial court, which is not the kind of thing one would do if one truly did not care whether its contents were disclosed. Dobbie also asked the court whether anything further needed to be disclosed to the defense and testified that she was trying to get her disclosures correct. There are facts on both sides for Taylor as well. She testified that she knew that the false assault charge was *Brady* material, suggesting a higher

level of culpability than exists for Dobbie.  At the same time, Dobbie, not Taylor, was the primary drafter of the motion and might therefore reasonably bear more responsibility for its omissions.  Ultimately, we do not perceive any material difference between the respondents when it comes to culpability.  And as to both, we find ourselves where the *Romansky II* court did: on the fence between recklessness and negligence and therefore unwilling to uphold a charge of reckless dishonesty.

We have no such ambivalence, however, about respondents' refusal to concede that Childs had made a false statement and mischaracterization of the Collins Report's conclusions.  There is simply no justifying the former.  As Taylor testified, at the time respondents filed the motion in limine, they had not reviewed any of the video or documentary evidence on which the Collins Report was based.  All they had to go on was the report itself and Taylor's pro forma *Giglio* interview with Childs that did not call the Collins Report into question so much as indicate that Childs was not aware of it.  The Collins Report says:

> Lieutenant Childs'[s] narrative suggests that at the time of the incident, inmate Heath was not restrained, displayed disruptive behavior, and was "kicking at" the canine causing Lieutenant Childs to use chemical agent to restore "normal operations."
>
> Upon review of the facts and circumstances of the incident, it is evident that Inmate Heath was in restraints

and not a threat to "normal operations" when he was sprayed with chemical agent by Lieutenant Childs.

During his interview with OIA investigators, Lieutenant Childs stated that the Incident Report he prepared regarding this matter was incorrect and written in error. . . .

Lieutenant Childs also composed and submitted a Disciplinary Report charging inmate Heath with Assault without Serious Injury and Lack of Cooperation. Video footage of the incident does not support the allegation that inmate Heath assaulted any Correctional Officer or canine.

The report does not just explain that Childs made several false or misleading statements; it says that he admitted to making one of them. We do not understand how respondents could have read this text and yet refused to concede that Childs had made a false or misleading statement unless they had some amount of indifference about whether their motion was truthful. The same is true for their contention that "[t]he conclusion that Officer Childs made a false or misleading statement is at odds with the body of the report and does not appear evident from the text of Officer Childs'[s incident report]." On the contrary, "[t]he conclusion that Officer Childs made a false or misleading statement" is completely consistent with the body of the report.

There is not enough evidence going the other way to justify these actions as anything but reckless. To be sure, the motion in limine does acknowledge one of

the Collins Report's adverse credibility determinations; it just takes issue with the accuracy of that determination. But that admission does little for respondents. Although it indicates that they were not entirely hiding the ball with respect to the contents of the report, it does not ameliorate their disregard for the truth of what actually happened, given that the only evidence they had for the truth was the report itself. While respondents' attempt to disclose the underlying report to the trial court mitigates any inference of reckless dishonesty with respect to the court, it does not do so with respect to the defense. Respondents' stated goal was to keep the Collins Report from the defense and thereby force the defense to rely entirely on the government's summary of the report in the motion in limine. Respondents succeeded. But as we have explained, the motion in limine both omitted key facts and put a misleading spin on the facts it included. Respondents therefore exhibited reckless disregard for whether the defense would ever know the truth about Childs's conduct. Turning the report over to the court with the well-founded expectation that the defense would never see it does not change any of this.[15]

---

[15] While we consider respondents' attempt to provide the Collins Report to the court in assessing both (1) whether respondents acted with reckless dishonesty in failing to include Childs's false assault charge in the motion in limine and (2) whether they acted with reckless dishonesty by casting doubt on the Collins Report in that motion, we reach different results in each case due to the balance of the other evidence. Dobbie's apparent confusion about the government's obligation to disclose the false assault charge mitigates the culpability of her decision not to

A final consideration is the conduct of respondents' superiors, in particular John Roth, head of the *Lewis* Committee. Roth cast doubt on the Collins Report's findings, stating in an email that he was "[n]ot sure that the DOC conclusion that [Childs] lied is supported by the record." Dobbie testified that she was influenced by Roth's view when writing the motion. But while Roth's email indicates that respondents were not operating in a vacuum, it does little to show that respondents were not acting recklessly. It is not as though Roth actually told respondents what representations and arguments to make to the court. Instead, he said he was leaving it to respondents to "hash . . . out" how to characterize the report.

Respondents hashed things out in a manner ultimately attributable to them. Dobbie testified that she had conducted a detailed reading of the Collins Report after receiving Roth's email and, based on that reading, had decided that she agreed with Roth. Moreover, it should have been apparent to respondents that Roth had not viewed any of the evidence on which the Collins Report was based, so his doubts about what the "record" supported lacked foundation. Nor were the views of senior attorneys in the U.S. Attorney's Office in lockstep. In his initial email to the *Lewis*

---

include that charge in the motion in limine. There is no similar mitigating fact related to respondents' refusal to concede that Childs had made *any* false or misleading statement and their assertion that the body of the report did not support the conclusion that Childs made such a statement. We also find it easier to discern recklessness with respect to affirmative statements respondents made in the motion, versus omissions of facts they ought to have included.

Committee, on which respondents were copied, Ragsdale said that DOC had "concluded that [Childs] lied." We also cannot lose sight of a fundamental point: respondents were federal prosecutors. They were vested with tremendous authority and discretion, and that comes with tremendous responsibility for their actions.

Ultimately, we hold that there is clear and convincing evidence that respondents acted with reckless dishonesty. To illustrate, we return to *Romansky II*. At bottom, *Romansky II* involved an attorney's failure to verify that his firm's new billing practices applied to particular clients. 938 A.2d at 741-42. Respondents argue that because they carefully reviewed the Collins Report, they are less culpable. We see things differently. Even after studying the Collins Report, respondents still wrote a motion that was obviously inaccurate in numerous ways. Their intimate familiarity with the truth makes it all the more apparent that they disregarded it. The attorney in *Romansky II* also made his mistakes at a time when such mistakes were most likely, because of his firm's recent changes to its billing practices. 938 A.2d at 741. There is no reason to believe that respondents suffered from any similarly understandable confusion; they simply read a report and then wrote a motion about that report without sufficient regard for whether their motion was accurate. We do not think the evidence shows that these misrepresentations were willful or intentional, but it does support the conclusion that they were reckless.

## C.     Rule 8.4(d)

We next affirm the Board's conclusion that respondents violated Rule 8.4(d), which makes it professional misconduct for a lawyer to "[e]ngage in conduct that seriously interferes with the administration of justice."   A Rule 8.4(d) violation requires three elements: (1) an attorney's conduct must be "improper," *In re Hopkins*, 677 A.2d 55, 60-61 (D.C. 1996); (2) it must "bear directly upon the judicial process (i.e., the 'administration of justice') with respect to an identifiable case or tribunal," *id.* at 61 (italics omitted); and (3) it must "taint the judicial process in more than a de minimis way; that is, at least potentially impact upon the process to a serious and adverse degree," *id.* (italics omitted).   Rule 8.4(d) does not have a strict scienter requirement; even conduct "somewhat less blameworthy" than recklessness—i.e., negligent conduct—can violate it.  *In re L.R.*, 640 A.2d 697, 701 (D.C. 1994).

The first two Rule 8.4(d) elements are clearly met.  Respondents' *Brady* violation was improper and bore on an identifiable case and tribunal.  The disputed question is whether respondents' improper conduct bore on the case and tribunal "in more than a de minimis way." *In re Hopkins*, 677 A.2d at 61 (italics omitted).  We conclude that it did.

We have often held that conduct that places a more-than-de-minimis burden on the time and resources of courts and litigants violates Rule 8.4(d).  In *In re Cole*, 967 A.2d 1264 (D.C. 2009), we held that an attorney's serious neglect of his client's case violated Rule 8.4(d) in part because it "led to an unnecessary expenditure of time and resources by the Immigration Court" and "required successor counsel to file a new motion, immigration prosecutors to file papers in opposition, the Immigration Court to prepare a Memorandum of Decision and Order denying the motion, all parties to prepare appellate documents for filing, and the Board of Immigration Appeals to draft an opinion."  *Id.* at 1266.  Similarly, in *In re Spikes*, 881 A.2d 1118 (D.C. 2005), we held that an attorney violated Rule 8.4(d) because his frivolous defamation actions "waste[d] the time and resources of this court, delay[ed] the hearing of cases with merit[,] and cause[d] appellees unwarranted delay and added expense."  *Id.* at 1127 (quoting *Slater v. Biehl*, 793 A.2d 1268, 1277 (D.C. 2002)).  This was true in substantial part because the motions "necessitated extensive [additional] briefing" and "additional pleadings."  *Id.* at 1126-27 (internal quotation marks omitted); *see In re Yelverton*, 105 A.3d 413, 427 (D.C. 2014) (holding that frivolous motions "tainted the judicial process in more than a de minimis way," in part because they "required responsive action from both the Superior Court and this court, as well as from the defendant" (italics omitted)); *In re Pearson*, 228 A.3d 417, 426-27 (D.C. 2020) (per curiam) (similar).

All the same, not all conduct that "place[s] an unnecessary burden on the administrative processes" of the judicial system violates Rule 8.4(d). *In re Hallmark*, 831 A.2d 366, 375 (D.C. 2003). It is ultimately a "matter of degree." *In re Yelverton*, 105 A.3d at 427. In *In re Hallmark*, an attorney submitted a late Criminal Justice Act voucher that "claim[ed] fees in an amount substantially above the statutory limit without providing supporting information" and then ignored the presiding judge's request for more information. 831 A.2d at 369. We held that although this conduct was "troubling and negligent," the burden it placed on the courts and the judge was not "more than . . . de minimis" and "did not seriously and adversely affect the administration of justice, or [the attorney's] client." *Id.* at 374-75 (italics omitted). We reached a similar conclusion in *In re Owusu*, 886 A.2d 536 (D.C. 2005), where an attorney did not maintain a current address with the D.C. Bar and as a result failed to receive notice of and respond to investigative inquiries from Disciplinary Counsel related to potential neglect of a client. *Id.* at 539-40. There, we explained that failing to comply with an administrative requirement such as maintaining a current address "does not 'bear directly on the judicial process,'" *id.* at 541, or "taint that process 'to a serious and adverse degree,'" *id.* at 542 (quoting *In re Hopkins*, 677 A.2d at 61).

Respondents' conduct resulted in a substantial and avoidable use of judicial time and resources, ultimately resulting in the vacatur of a criminal conviction. It

therefore "taint[ed] the judicial process in more than a de minimis way." *In re Hopkins*, 677 A.2d at 61 (italics omitted). As the Hearing Committee recounts, "[i]n addition to the pre-hearing conference treating the disclosure issue and the trial time spent renewing and reviewing the Court's initial determination, there were five post-conviction hearings in the Superior Court spanning 14 months after the return of the jury verdicts" as a result of respondents' actions. Worse yet, several of the *Vaughn* defendants received prison sentences—one of whom, Morton, served four years in prison before his conviction was reversed due to respondents' *Brady* violation, after which he was not retried. The impact on the judicial process, the resources of the court system, and the lives of the defendants was far greater than that at issue in *In re Hallmark* and *In re Owusu* and much more analogous to that in cases where we have found Rule 8.4(d) violations, such as *In re Cole*, *In re Spikes*, and *In re Yelverton*. As in those cases, respondents' actions resulted in additional pleadings, briefings, hearings, and ultimately a published opinion from this court in *Vaughn*.

Respondents' contrary arguments are not convincing. They largely ignore the cases establishing that a more-than-de-minimis waste of judicial and litigant time and resources can give rise to a Rule 8.4(d) violation. They focus instead on a single quote from *In re Alexander*, 496 A.2d 244 (D.C. 1985) (per curiam), where the court stated that Rule 8.4(d)'s predecessor rule, DR 1-102(A)(5), "is purposely broad to encompass derelictions of attorney conduct considered reprehensible to the practice

of law." *Id.* at 255. They try to use that quote, along with language from *In re Hallmark* and *In re Owusu,* to argue that Rule 8.4(d) requires culpability amounting to recklessness at a minimum. Respondents are correct that *In re Owusu* implies, at least in the context of abiding by an administrative regulation like maintaining a current address on file with the Bar, that some degree of recklessness or intentionality is highly relevant to a Rule 8.4(d) violation, even if not strictly required. *See* 886 A.2d at 542 ("[T]he issue would be different if evidence showed that Owusu had willfully blinded himself to Bar Counsel's inquiries; under our decisions, purposefully evading an inquiry by changing address without notifying the Bar would presumptively, and seriously, affect the disciplinary process. But there was no proof of deliberate avoidance on Owusu's part."). But the court in *In re L.R.* rejected a strict recklessness requirement, and *In re Owusu* does not purport to abrogate *In re L.R.*, nor could it have. *In re L.R.*, 640 A.2d at 700-01. It is also relevant that respondents' conduct did not involve an administrative violation as in *In re Owusu*; it involved a *Brady* violation that, when revealed, resulted in the reversal of a criminal conviction. Therefore, any elevated scienter requirement we suggested *In re Owusu* should not be understood to apply to actions like those of respondents. In any event, as we have just explained, respondents acted with reckless dishonesty, so even under a broader reading of *In re Owusu* it would be appropriate to find a Rule 8.4(d) violation. Nor are we as confident as are

respondents that their *Brady* violation was not "reprehensible to the practice of law." *In re Alexander*, 496 A.2d at 255.

### D.     Rule 3.4(d)

The Hearing Committee reasoned that because respondents violated Rule 3.8(e), they *a fortiori* violated Rule 3.4(d), which prohibits attorneys from "fail[ing] to make reasonably diligent efforts to comply with a legally proper discovery request by an opposing party" in "pretrial procedure."  The Board disagreed.  In its view, the specific governed the general: although Rule 3.8(e) *Brady*-type violations are in some basic sense also failures of discovery compliance, Rule 3.8(e) is directed only at such violations, so it, not Rule 3.4(d), should control. Disciplinary Counsel did not take exception to the Board's recommendation on appeal, so we decline to disturb it.  *Cf. In re Chapman*, 284 A.3d 395, 400-01 (D.C. 2022).

### IV.    Sanction

We turn last to the issue of the appropriate sanction.  The Board recommended that respondents be suspended for six months, and "[g]enerally speaking, if the Board's recommended sanction falls within a wide range of acceptable outcomes, it will be adopted and imposed." *In re Kline*, 113 A.3d at 215 (quoting *In re Howes*,

39 A.3d 1, 13, *as amended nunc pro tunc*, 52 A.3d 1 (D.C. 2012)). But, as noted, we will not defer to the Board where doing so "would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar R. XI, § 9(h)(1). Thus, while we always accord respect to the Board's recommendation, "the responsibility of 'imposing sanctions rests with this court in the first instance.'" *In re Chapman*, 284 A.3d at 403 (quoting *In re Godette*, 919 A.2d 1157, 1164 (D.C. 2007)). In our view, the Board gave insufficient weight to the significant mitigating circumstances in this case. We thus adopt the recommended six-month suspension but stay it in favor of a one-year term of probation.

Our cases set forth seven non-exhaustive factors for consideration when determining the appropriate sanction for attorney misconduct: (1) the seriousness of the conduct; (2) the prejudice, if any, to the client; (3) whether the conduct involved dishonesty; (4) whether the attorney violated other disciplinary rules; (5) the attorney's disciplinary history; (6) whether the attorney has acknowledged his or her wrongful conduct; and (7) any mitigating circumstances. *See In re Martin*, 67 A.3d at 1053. Ultimately, "[a]n appropriate sanction is one that is necessary to protect the public and the courts, maintain the integrity of the profession, and deter other attorneys from engaging in similar misconduct." *In re Kline*, 113 A.3d at 215 n.9. "In all cases, our purpose in imposing discipline is to serve the public and

professional interests . . . rather than to visit punishment upon an attorney." *In re Reback*, 513 A.2d 226, 231 (D.C. 1986) (en banc). Within this general framework, this court is obligated to treat like cases alike. *See* D.C. Bar R. XI, § 9(h)(1); *In re Cleaver-Bascombe*, 986 A.2d 1191, 1194 (D.C. 2010) (per curiam).

*Seriousness of the conduct*: Respondents' conduct was serious. While some Rule 3.8(e) violations may be more egregious than others, none are trivial. Our opinion in *Vaughn* left no doubt about the gravity of what happened here—*Brady* violations that led to the reversal of Morton's criminal conviction. 93 A.3d at 1266. We are obligated to take *Brady* violations particularly seriously not only due to their devastating potential consequences in any given case, but also because *Brady* violations are both common and difficult to detect. Kevin C. McMunigal, *Disclosure and Accuracy in the Guilty Plea Process*, 40 Hastings L.J. 957, 962 n.22 (1989) ("*Brady* violations are hard to detect. Unless the defendant somehow fortuitously learns of the exculpatory information and the prosecution's possession of it, a *Brady* violation will never come to light.").

*Prejudice to the client*: A prosecutor's client is the general public, rather than any specific government agency or criminal victim. ABA Standards for Criminal Justice, Prosecutorial Investigations, Standard 1.2(b) (Am. Bar Ass'n 3d ed. 2014). Any action by a prosecutor that erodes the public's trust in the criminal justice

system's ability to correctly mete out justice is therefore prejudicial. Respondents' conduct, which cast doubt on the reliability of that system, thus weighs in favor of a harsher sanction.

*Dishonesty*: Respondents' conduct also involved dishonesty, although we take a different view of the gravity of that dishonesty for sanctions purposes than the Board did. As we have explained, several of the assertions respondents made in the motion in limine evinced a reckless disregard for the defendants' right to know the truth about Childs's conduct and history of dishonesty. That is a serious matter, and the Board is correct that some of our cases have considered dishonesty a substantial aggravating factor in the sanctions analysis. *See, e.g.*, *In re Howes*, 52 A.3d at 22, 25; *In re Cleaver-Bascombe*, 986 A.2d at 1199-1200.

But *In re Howes* and *In re Cleaver-Bascombe*, the cases on which the Board relies, are different from this case in three ways. First, the attorneys in *In re Howes* and *In re Cleaver-Bascombe* were intentionally dishonest—flagrantly so. *In re Howes*, 52 A.3d at 4, 16-18; *In re Cleaver-Bascombe*, 986 A.2d at 1195-96. They misused court funds and then affirmatively concealed the misconduct; they were therefore disbarred. *In re Howes*, 52 A.3d at 25; *In re Cleaver-Bascombe*, 986 A.2d at 1201. Respondents' dishonesty was quite different. While problematic, their dishonesty was reckless, not intentionally malicious. Second, the attorneys in *In re*

*Howes* and *In re Cleaver-Bascombe* were repeatedly dishonest. *See In re Howes*, 39 A.3d at 16 ("The nature of a case is made more egregious by repeated violation of a rule prohibiting dishonest conduct."). In *In re Cleaver-Bascombe*, the attorney submitted a false voucher and then "exacerbated the misconduct with false testimony at the [disciplinary] hearing." 986 A.2d at 1198. The attorney in *In re Howes* wrongfully distributed more than $42,000 worth of witness vouchers in multiple felony prosecutions over the course of two years. 39 A.3d at 4-6. Here, on the other hand, respondents' dishonesty was confined to one isolated case. Third, in *In re Howes* and *In re Cleaver-Bascombe*, the court was focused on the need "to deter other attorneys from engaging in similar misconduct." *In re Cleaver-Bascombe*, 986 A.2d at 1199-1200 (quoting *In re Reback*, 513 A.2d at 231); *see In re Howes*, 52 A.3d at 22. Here, it is worth nothing that the U.S. Attorney's Office overhauled their approach to *Brady* after *Vaughn* in order to prevent incidents like this, thereby providing important deterrence outside of the disciplinary context.

Accordingly, while dishonesty factors into our analysis, we do not think it requires the kind of upward adjustment the Board recommended.

*Violation of other disciplinary rules*: The "violation of other disciplinary rules" prong of the analysis considers how many rules were violated. Respondents violated three: Rules 3.8(e), 8.4(c), and 8.4(d). But because all of the violations in

this case arose out of essentially the same conduct, we do not think this factor weighs heavily here.

*Disciplinary history and acknowledgment of wrongdoing*: Neither Dobbie nor Taylor has any prior disciplinary history, and they both have acknowledged the wrongfulness of their conduct to the extent consistent with mounting a robust defense in a difficult case. We have "recognize[d] that an attorney has a right to defend himself and we expect that most lawyers will do so vigorously, to protect their reputation and license to practice law." *In re Yelverton*, 105 A.3d at 430. It would not be appropriate to hold respondents' exercise of that right against them where, as here, respondents admitted that they had made mistakes and stated again and again that they would do things differently if given the opportunity.

*Mitigating circumstances*: We identify one overriding mitigating circumstance: the deficient conduct of respondents' supervisors, John Roth and Jeffrey Ragsdale, in their oversight of this case. Roth erred in at least two ways. First, as head of the *Lewis* Committee, it was his responsibility to ensure that the committee acted expeditiously and gave respondents ample opportunity to carefully execute its decisions. The committee did not do so here. Respondents and Ragsdale brought the Childs matter to the committee's attention on September 29. Several weeks later, having heard nothing, respondents prevailed on Ragsdale to follow up.

Only after another week had passed, on October 21, did Roth respond with the committee's decision. At this point, the trial was less than two weeks away. Even if the guidance Roth ultimately provided had been careful and useful—to be clear, it was neither—he still left the case team in the lurch for nearly a month while the credibility of one of its key witnesses was in question and trial was fast approaching.[16]

Roth also made a mistake by expressing unsubstantiated skepticism about the Collins Report's conclusions—skepticism that found its way into respondents' motion in limine. As noted, he told respondents: "My personal opinion is that the officer's written report is simply unclear, and the officer attempted to clear it up in his interview. Not sure that the DOC conclusion that he lied is supported by the record, but I will leave it to you folks to hash that out." But it bears repeating—Roth had no record before him against which to evaluate the Collins Report's findings and conclusions. Childs's incident report was not "simply unclear" in its charge that Heath had behaved in a "violent/disruptive" manner. It was, in fact, inaccurate.

---

[16] We agree with the dissent that the Lewis Committee is "not a *Brady* committee," and that the Lewis Committee's inquiry is not co-extensive with that required by *Brady*. *See infra* page 76. However, we also see the Lewis Committee's long delay as one more example of the U.S. Attorney's systemic failure to adequately supervise its young prosecutors. The Committee's delay did play a role in the decisions these prosecutors made, and we therefore find it to be a mitigating circumstance.

There is also no valid argument that Childs's false disciplinary report was merely unclear, because no portion of that report was included in the Collins Report. While we ultimately must hold respondents accountable for their actions—they are the sole signatories of the motion in limine—we find it significant that Roth's inaccurate framing of the matter informed the motion in limine.

Ragsdale, too, played a role in this case going awry. While there was some dispute among members of the Hearing Committee on this score, we think substantial evidence supports the conclusion that Ragsdale directed respondents to proceed ex parte, thereby disclosing the Collins Report only to the court and not to the defense. This was a regrettable instruction. We see no reason why disclosing the report to the defense subject to a protective order would not have adequately addressed the government's security or personnel concerns. Ragsdale thus advised respondents to take a risky strategy in a case that did not demand it. After doing so, he did not appear to exercise further oversight to ensure that respondents nevertheless made all required disclosures. To be sure, respondents are ultimately responsible for their own decisions. But their supervisors did them no favors, and their sanction should reflect as much.

We are also guided by the imperative to avoid "inconsistent dispositions for comparable conduct." D.C. Bar R. XI, § 9(h)(1). We are aware of only three

Rule 3.8(e) cases apart from this one. One of those, *In re Howes*, is inapposite and involved an extensive pattern of more egregious conduct than that at issue here. 52 A.3d at 5-8. The other two are *In re Kline* and *In re Cockburn*, Bar Docket No. 2009-D185 (Letter of Informal Admonition), the latter of which did not result in a published opinion from this court. *In re Kline* is thus the most relevant precedent.

Kline violated Rule 3.8(e) only, and the Board recommended a 30-day suspension. *In re Kline*, 113 A.3d at 215. After looking at cases from other jurisdictions, this court identified the range of sanctions "that generally would be appropriate" for such conduct to be anything from a public reprimand to a six-month suspension. *Id.* Although a 30-day suspension fell within that band, the violation in *In re Kline* rested on an issue regarding the proper understanding of Rule 3.8(e) that had generated "a great deal of confusion" in the legal community. *Id.* Specifically, Kline had not actually violated *Brady*, because to violate *Brady* a prosecutor must withhold information that is "material" to guilt or innocence, and the information Kline withheld was not. *Id.* at 206-07, 215-16. Before *In re Kline*, it was widely assumed that *Brady*'s materiality requirement also applied to Rule 3.8(e). *Id.* at 215-16. In *In re Kline* itself, we held the opposite. *Id.* But because we were clarifying the law for the first time, we felt it unfair to penalize Kline for his "wrong"

but "not unreasonable" understanding of Rule 3.8(e)'s requirements and therefore imposed no sanction. *Id.* at 216.

Determining the appropriate sanction requires balancing a wide array of competing interests and factors. As the preceding paragraphs make clear, various considerations cut both in favor of and against a harsh penalty. The Board's recommended six-month suspension accounts for these considerations—and we owe deference to that determination. At the same time, the respondents here have clean disciplinary slates and committed the relevant violations due in large part to the collective action and inaction of members of their office. Our responsibility to properly sanction their wrongdoing and deter future misconduct is moderated by the knowledge that they are not solely responsible for the disciplinary infractions in question.[17]

---

[17] In this way, respondents are different from, for example, a solo practitioner who recklessly misappropriates client funds. *See, e.g.*, *In re Gray*, 224 A.3d 1222, 1234-35 (D.C. 2020). By definition, solo practitioners are solely responsible for disciplinary infractions they commit. We therefore disagree with the dissent's argument that our decision today is necessarily inconsistent with the harsh sanctions we routinely issue in misappropriation cases. It is true that, "in virtually all cases of misappropriation, disbarment will be the only appropriate sanction." *In re Addams*, 579 A.2d 190, 191 (D.C. 1990) (en banc). But it is also true that (1) this practice is common nationwide, *see State ex rel. Couns. for Discipline of Neb. Sup. Ct. v. Nimmer*, 916 N.W.2d 732, 750 (Neb. 2018), and (2) an outsized number of our misappropriation cases concern solo practitioners, *see, e.g.*, *In re Gray*, 224 A.3d at 1225, 1235 (D.C. 2020) (disbarring solo practitioner for misappropriating client

For these reasons, we conclude that a six-month suspension, stayed in favor of a one-year probationary period, is warranted. The length of the suspension reflects the gravity of the violation, while the stay acknowledges that the respondents should not, and probably do not, shoulder full responsibility. We believe that this result strikes the proper—though nuanced—balance that this case requires.

Stays of suspensions are typically reserved for situations where attorneys commit clearly sanctionable conduct, but under circumstances that explain or blunt their culpability. *See, e.g.*, *In re Peek*, 565 A.2d 627, 631-34 (D.C. 1989) (concluding that the attorney's clinical depression was causally connected to his misconduct and therefore a sufficient mitigating factor to warrant a stay); *In re*

---

funds), *In re Edwards*, 990 A.2d 501, 524, 530 (D.C. 2010) (same), *In re Cloud*, 939 A.2d 653, 658, 664 (D.C. 2007) (same), *In re Berryman*, 764 A.2d 760, 761, 774 (D.C. 2000) (same), *In re Marshall*, 762 A.2d 530, 531, 540 (D.C. 2000) (same). Because solo practitioners do not have the same checks on their conduct that lawyers (public and private) have in larger organizations, it is especially difficult for this court to ensure that violations will not recur. *Compare In re Hessler*, 549 A.2d 700, 716 (D.C. 1988) (holding that an attorney's misappropriation of client funds "may have been influenced in part by the fact that he was . . . a sole practitioner," and the fact that he "is now associated with a firm where he is not directly responsible for client funds . . . suggests that similar misconduct will not occur in the future"), *with In re Ekekwe-Kauffman*, 267 A.3d 1074, 1082 (D.C. 2022) (disbarring a solo practitioner who had repeatedly misappropriated client funds and "did not meaningfully change her accounting practices to prevent future misappropriations.") A law firm or government entity, on the other hand, can prevent future negligent infractions by firing attorneys for intentional misconduct and reforming their policies (as the U.S. Attorney's Office did here). Thus, although this court is obligated to treat like disciplinary cases alike, this case is simply not like that of a solo practitioner who misappropriates client funds. D.C. Bar R. XI, § 9(h)(1).

*Mooers*, 910 A.2d 1046, 1046-47 (D.C. 2006) (similar). *Cf. In re Pearson*, 228 A.3d at 428 (declining to impose a stay, even where the Hearing Committee had recommended one, because the sanctions factors were generally aggravating).

While stays are an established mechanism in the disciplinary context, *see, e.g.*, *In re Johnson*, 158 A.3d 913 (D.C. 2017), we recognize that they are usually imposed pursuant to the Board's recommendation. Even so, we have previously exercised our discretion to implement stays that depart from the Board's guidance. For example, in *In re Askew*, 96 A.3d 52 (D.C. 2014), the Board (and the Hearing Committee) had recommended that we issue a 30-day suspension stayed in favor of a one-year term of probation. *Id.* at 54. Neither Askew nor Disciplinary Counsel filed exceptions to the Board's recommendation. *Id.* But rather than approve the uncontested recommendation, we concluded that such a sanction was "inadequate" and elected to suspend Askew for six months, with all but 60 days stayed.[18] *Id.* at 59, 62.

---

[18] As the body with ultimate disciplinary decision-making authority, we also have discretion to implement or modify probationary periods as part of an attorney's sanction. *See* D.C. Bar R. XI, § 3(a)(7) ("Probation may be imposed in lieu of or in addition to any other disciplinary sanction."); *In re Adams*, 191 A.3d 1114, 1118, 1123 (D.C. 2018) (extending an attorney's probationary period to 18 months, despite the Board's recommendation that the probation only last one year).

Because we believe that the Board's recommendation in this case similarly does not fairly account for all of the relevant considerations, we conclude that a stay of respondents' suspensions—subject to probationary requirements—is appropriate.

For the duration of the one-year probationary period, respondents must refrain from committing any crimes or violating any further Rules of Professional Conduct. In the event that either respondent fails to comply, that respondent's six-month suspension will take effect from the date of noncompliance.

## V.    Conclusion

For the foregoing reasons, Mary Chris Dobbie and Reagan Taylor are hereby suspended from the practice of law in the District of Columbia for six months, stayed as to all in favor of a one-year term of probation.

*So ordered*.

DEAHL, *Associate Judge*, dissenting:  Carl Morton and Alonzo Vaughn were each sentenced to seven years' imprisonment after being convicted for attacking a fellow inmate and a corrections officer who came to his aid.  They did not know at the time of trial that Officer Angelo Childs, one of two witnesses who identified them as the culprits based on grainy and choppy surveillance footage, had very recently been caught falsely implicating another inmate in an assault, as detailed in the "Collins Report."[1]  The reason they did not know that is that their prosecutors and the respondents before us—Mary Chris Dobbie and Reagan Taylor—failed to disclose this critical fact, in violation of their clear constitutional obligations to do so.  *See Vaughn v. United States*, 93 A.3d 1237, 1266 (D.C. 2014) (disclosure "should not have been a hard call"); *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

In more detail, the respondents (1) affirmatively misrepresented the Collins Report's contents to the defense in their motion in limine, omitting its most important finding (that Officer Childs, in coordination with other officers, falsely implicated another inmate in an assault); (2) purported to turn over the entire report to the trial judge for ex parte review, but in reality submitted an incomplete report missing the same exculpatory evidence that they failed to summarize in their motion in limine (the relevant passages cut off by a claimed "faxing error"); and (3) assured

---

[1] Benjamin Collins was an investigator for the Department of Corrections Office of Internal Affairs asked to investigate Childs's potential misconduct.

the trial judge, when he noted that he seemed to be missing key pages, that he had the Collins Report in its entirety. I agree with my colleagues that Dobbie and Taylor thereby violated Rules 3.8(e), 8.4(c), and 8.4(d) of the District of Columbia Rules of Professional Conduct.

I do not agree with my colleagues that a six month suspension from the practice of law is too harsh a sanction for their misconduct. The nine members of the District's Board on Professional Responsibility unanimously recommended a six month suspension after carefully considering Dobbie and Taylor's misconduct and weighing its seriousness. Not only is that recommendation "within the wide range of acceptable outcomes" that we are bound to defer to, *In re Ekekwe-Kauffman*, 210 A.3d 775, 797 (D.C. 2019) (quoting *In re Martin*, 67 A.3d 1032, 1053 (D.C. 2013)), in my view it was based on a charitable construction of the facts under which a six month suspension remains on the more lenient side of an acceptable sanction.

The majority notes just "one overriding mitigating circumstance" driving its departure from the Board's recommendation: respondents' supervisors "did them no favors." *Supra* at 64, 66. I disagree. Those supervisors did respondents the favor of telling them to disclose the Collins Report's contents to the defense. If respondents had abided that direction they would not be before us today. Lost in the majority's discussion of the supervisors' failings is the simple fact that nobody

advised Dobbie and Taylor to commit any of the misconduct underlying their disciplinary infractions. Nobody advised them to conceal the exculpatory evidence. Nobody told them to misrepresent the Collins Report's contents in their motion in limine or to provide the trial judge with only a partial report that omitted the same critical portions they neglected to summarize in their motion. And nobody told them to falsely assure the judge that he had the entire report when he correctly flagged that portions were missing. Had any of that advice been offered, no fit prosecutor would have followed it. So I do not share my colleagues' view that it is really the supervisors who are largely to blame here, and the limited blame that can fairly be attributed to them does not mitigate respondents' culpability in any event.

Dobbie and Taylor should face real consequences for their actions—Morton certainly did when he spent more than four years imprisoned for offenses that the government would not even retry him for once respondents' *Brady* violations came to light. The majority instead, after paying repeated lip service to the severity of respondents' misconduct, doles out a probationary sanction directing them to "refrain from committing any crimes or violating any further Rules of Professional Conduct" for a year. That slap on the wrist does not adequately reflect the seriousness of respondents' misconduct here, nor does it adequately protect future criminal defendants from meeting a fate similar to Morton's.

Finally, I am troubled by what the majority's opinion reveals about this court's values when policing the District's bar. As a court, we almost invariably disbar attorneys who have engaged in even the slightest reckless or intentional misappropriation of client funds. *In re Addams*, 579 A.2d 190, 191 (D.C. 1990) (en banc). Even *negligent* misappropriation will result in "the usual sanction" of a six month suspension from the practice of law. *In re Greenwald*, 926 A.2d 169, 171 (D.C. 2007). That is too harsh a result, the majority concludes, when prosecutors intentionally suppress evidence in violation of the Constitution and thereby secure felony convictions resulting in years of unjust imprisonment. I disagree and dissent.

## I. The Recommended Sanction Is Appropriate

### A. The Majority Misallocates Blame for the Misconduct

The most critical points of departure between the majority and I are that I do not believe Dobbie and Taylor's supervisors, John Roth and Jeffrey Ragsdale, are largely to blame here. Nor do I think the failings of those supervisors mitigate Dobbie and Taylor's own wrongdoing. Those supervisors' failings, thoroughly accounted for in the Board's report, are not an "overriding mitigating circumstance" that justifies departing from the Board's recommended sanction. I will discuss the relative culpability of the supervisors and the respondents in turn.

*Roth Cannot Be Scapegoated*

I begin with Roth, to whom the majority assigns an outsized portion of the blame due to two purported failings: (1) his *Lewis* committee took too long to advise respondents on whether they could call Officer Childs as a witness, and (2) he expressed "unsubstantiated skepticism" about the Collins Report. *Supra* at 65-66. It should be noted up front that Roth was never even asked to advise on whether the Collins Report's contents should be turned over to the defense, but he nonetheless offered one piece of advice on that front: "disclose" it. As the Board accurately recounted, that meant "disclose the information in the Collins Report *to the defense*." (emphasis added). I fail to see how Roth bears any share of the blame for *Brady* violations stemming from respondents' failures to do precisely what he gratuitously advised. If Dobbie and Taylor had heeded Roth's advice, they would not be here.

Let me next be clear on what the *Lewis* committee is and what it is not, because it underscores why I think the majority is mistaken to belabor its delays. The *Lewis* committee advises on whether the government should even call a particular witness in its case, or if instead the witness's credibility issues are so severe that the government will not even have them take the stand. But it is emphatically *not* a *Brady* committee asked for advice on what evidence should be turned over to the defense. There can be oodles of clear and obvious *Brady* material impeaching a

government witness whom the government nonetheless chooses to have testify. If there is evidence so damning that prosecutors have to ask if they can even call the witness to the stand, they already have the answer to any *Brady* question: that evidence needs to be turned over to the defense. The *Lewis* committee's delayed advice on whether Dobbie and Taylor should sponsor Childs as a witness was thus irrelevant to their *Brady* violations. They were not thrust into any "lurch" by the committee's delays, as the majority posits, because they were constitutionally required to turn the Collins Report over to the defense no matter what the *Lewis* committee advised.[2]

It was in fact improper for Dobbie and Taylor to even wait for the *Lewis* committee's advice before turning over the *Brady* material. *Brady* requires disclosures to be made "at the earliest feasible opportunity." *See Miller v. United States*, 14 A.3d 1094, 1108 (D.C. 2011) (citation omitted). We have emphasized

---

[2] That would be true even if, counterfactually, Dobbie and Taylor had ultimately opted not to call Childs as a witness. Childs was the first of two officers who identified Morton and Vaughn as the assailants, and the other was Sergeant Harper. Harper was on the scene and could not identify Morton or Vaughn from his direct observations of the melee. He did so only after watching surveillance footage of the assault *with Childs*. The fact that Childs's previous fabrications were backed by other officers would have provided a potent attack on the government's entire case whether or not he testified—Childs got the entire case against Morton and Vaugn rolling. Dobbie was thus wrong when she testified that she would have had no *Brady* obligation to disclose the Collins Report had respondents not called Childs as a witness. It is concerning that she apparently continues to think that.

again and again that "a prosecutor's timely disclosure obligation with respect to *Brady* material can never be overemphasized, and the practice of delayed production must be disapproved and discouraged." *Id.* (citing *Boyd v. United States*, 908 A.2d 39, 57 (D.C. 2006)). Dobbie and Taylor should have disclosed the Collins report to the defense right after they read it, and certainly no later than when they realized that it raised a question worth putting to the *Lewis* committee. Nobody advised them otherwise, and it was not "a hard call." *Vaughn*, 93 A.3d at 1266. The *Lewis* committee's delay is thus irrelevant to the *Brady* violations because respondents had no valid reason, and were not even permitted, to wait on that committee's advice.

Plus, it would have made no conceivable difference if Roth and the *Lewis* committee had more promptly advised respondents to disclose the Collins Report to the defense. Perhaps respondents' incomplete disclosures would have been more timely, but there is no reason to think respondents would have disclosed the critical information that they otherwise failed to disclose at every turn. In fact, eight months *after* the *Lewis* committee rendered its advice, respondents maintained in their post-trial pleadings that "the relevant portions" of the Collins Report "were disclosed in the Motion in Limine." So what we know is that even with eight months of reflection, respondents saw nothing wrong with keeping the critical exculpatory evidence concealed.

The majority next faults Roth for expressing "unsubstantiated skepticism" about the Collins Report's findings. Two things about that: First, and most importantly, this comment was accompanied by Roth's unequivocal advice to disclose the Collins Report to the defense, so his skepticism cannot possibly justify respondents' failures to heed that advice. Second, Roth's skepticism is at least partly attributable to respondents misdirecting the *Lewis* committee's attention to a relatively innocuous aspect of the Collins Report. This second point, while a relatively minor one, requires elaboration because it speaks to a pattern regarding respondents' misconduct that cannot be easily squared with the Hearing Committee's findings of inadvertence.

To paraphrase the Collins Report, it found that Childs filed an incident report that told a smaller implied lie and a bigger overt lie. The smaller implied lie was that Childs falsely suggested that an inmate whom he maced was unrestrained. Childs's report from that incident did not actually say that, but implied it by saying that the inmate was "placed in restraints" after he was maced. When Dobbie summarized the relevant issue for the *Lewis* committee, *this was the only aspect of the Collins Report's findings that she mentioned*—that "Childs" falsely "wrote in his report that the inmate was placed in restraints <u>after</u> he was maced." So it is no mystery why Roth speculated that Officer Childs was "simply unclear" in this aspect of his incident report. As the Board put it, this was "the kind of thing that could be

an inaccurate detail in an otherwise honest report." Maybe the inmate was restrained before being maced and then subjected to additional restraints afterward, so that Childs said nothing inaccurate at all. Roth's skepticism was responsive to the one and only aspect of the Collins Report that Dobbie had focused the *Lewis* committee's attention on. And that aspect of the Collins Report is irrelevant to the *Brady* violations here, because the respondents *did* disclose this smaller implied lie to the defense before trial.

The bigger overt lie identified by the Collins Report was that Childs fabricated an assault on a police K-9 and falsely charged the inmate with that offense, claiming the imagined assault prompted him to mace the inmate in the first place. And then Childs apparently colluded with multiple other officers to support his false account of that assault. That was the evidence critical to Morton and Vaughn. Morton and Vaughn maintained that Childs and another officer had falsely implicated them in a criminal assault, just as (unbeknownst to them) Childs had previously, in coordination with other officers, falsely implicated another inmate in a criminal assault. Dobbie made *no mention of those facts* in her synopsis of what she was asking the *Lewis* committee to opine upon; respondents later omitted those same facts from their motion in limine; and a fax machine then happened to malfunction (or something) right before transmitting the page of the Collins Report that would have laid those facts bare for the court.

Roth's skepticism was at least partly a byproduct of respondents misdirecting him and the *Lewis* committee to a relatively innocuous portion of the Collins Report. I do not see that as a mitigating factor in their favor. Regardless, Roth's bottom line was to disclose the Collins Report's contents to the defense, so the blame for respondents' failure to do that cannot be deflected unto him.

### *Ragsdale Cannot Be Scapegoated*

The majority next shifts blame to Ragsdale. Like Roth, Ragsdale never advised Dobbie and Taylor to conceal the contents of the Collins Report from the defense, but instead told respondents to disclose them. The majority nonetheless casts blame on him because he supposedly told respondents to file the actual report with the court ex parte while summarizing its pertinent contents for the defense. Assuming that was in fact Ragsdale's advice,[3] I agree with the majority that it was bad advice. But it was only a "risky strategy," as the majority puts it, *supra* at 66, to the extent that Dobbie and Taylor could not be trusted to competently summarize the report's contents and to transmit the entire report to the court for review.

---

[3] The Hearing Committee was split 2-1 over whether Ragsdale had instructed Dobbie and Taylor to proceed in this manner. Neither Ragsdale nor Taylor had any memory of such an instruction, but Dobbie said she remembered it, and Ragsdale surmised that he must have given it because he could not imagine why else respondents would have proceeded in the manner they did.

Respondents' disciplinary infractions thus did not stem from Ragsdale's advice either, but once again, stemmed from their failures to carefully abide it.

The majority's complaints with Ragsdale are effectively that he did not stop respondents from engaging in their misconduct, but that is not any sort of mitigating factor that I am familiar with. The majority laments that Ragsdale "did not appear to exercise further oversight to ensure that respondents . . . made all [the] required disclosures" he told them to make in their motion in limine. But there is (1) no indication that either Dobbie or Taylor ever sought his input or asked him to review their motion in limine, and (2) no evidence that line prosecutors generally require such handholding. Ragsdale did not independently demand to review the motion in limine because, in his words, he "had full faith that" respondents would provide "an accurate statement of the facts." It is a disservice to line prosecutors everywhere to suggest that such faith is misplaced and that supervisors must directly oversee matters as simple as summarizing a report's critical findings and faxing the complete report for the court's review.

Respondents are professional federal prosecutors, not hapless amateurs. They undertook the enormous responsibility of representing the United States in a trial featuring multiple defendants and dozens of felony charges. U.S. Attorney's Offices could not function if supervisors were required to micromanage their subordinates'

every simple task.  The top of page six of the Collins Report succinctly captured the most relevant *Brady* material that respondents could have (and should have) relayed verbatim, without the need for any summarizing:

> Childs'[s] narrative suggests that at the time of the incident, inmate Heath was not restrained, displayed disruptive behavior, and was 'kicking at' the [police K-9]. . . . Childs also composed and submitted a Disciplinary Report charging inmate Heath with Assault without Serious Injury and Lack of Cooperation.  Video footage of the incident does not support the allegation that inmate Heath assaulted any Correctional Officer or K-9.

All Dobbie and Taylor had to do was copy and paste these lines from the Collins Report, which just so happen to appear immediately after a block quote that was in their motion in limine, and immediately after their apparent faxing error cut off the report at page five.[4]  I do not see Ragsdale's failure to micromanage the simple tasks of accurately summarizing and transmitting that evidence as mitigating respondents' culpability.

---

[4] I take it as an established factual finding that there was a faxing error that led to the critical pages of the Collins' Report never reaching the court, but it is far from the most natural inference from the evidence before the Hearing Committee.

*The Blame Lies with Dobbie and Taylor*

Now let's focus on Dobbie and Taylor's responsibility for their actions. The evidence against them readily supported either of two very different conclusions. The first, more nefarious explanation of what happened is that respondents made repeated errors in judgment: (1) they chose not to tell the defense that Childs had previously, and in coordination with other officers, falsely implicated an inmate in an assault; (2) they intentionally did not highlight that adverse finding for the *Lewis* committee; (3) they purposefully omitted those facts from their motion in limine summarizing the Collins Report; (4) they then purposefully faxed only part of the Collins Report to the court, omitting the same critical information that they omitted from their motion in limine; and (5) when the court noticed the apparently missing pages, they decided to lie and cover their tracks by falsely assuring the court that it had the entire report.

There was no shortage of evidence supporting this more nefarious narrative. Dobbie herself testified that she did not think she was required to disclose the fact that Childs had falsely accused another inmate of assaultive behavior. The motion in limine she drafted, as the Board accurately put it, "dramatically misconstrued the adverse finding about Childs'[s] credibility that was made in the" Collins Report, "include[d] a great deal of detail about the Collins Report, yet scrupulously

avoid[ed] mention of the false disciplinary charge," and "include[ed] a block quote from the Collins Report that"—just like respondents' fax to the court—cut off immediately before "the Report discusses the false disciplinary charge." If the findings before us were that respondents took these intentional steps to keep this exculpatory evidence from coming to light, then we would not be here debating a six month suspension. We would instead be talking about disbarment, in what I could only hope would be a brief discussion because that would be the only suitable sanction.

The Hearing Committee, quite generously to respondents, adopted a more innocuous explanation for their misconduct. It concluded that respondents' failings were primarily not errors of judgment but errors of care. In other words, respondents (1) failed to competently summarize the Collins Report's key findings in their motion in limine and carelessly omitted the aspects of the report that were most damaging to the government's case; (2) Dobbie then attempted to fax the entire Collins Report to the court but an unnoticed faxing error cut the report off just one sentence before the most exculpatory evidence in the report, mirroring where their motion in limine cut off a block quote; and (3) when the court informed them that

they had appeared to transmit only a partial report, Dobbie then carelessly believed the court was mistaken and assured the court that it had the full report.[5]

Under this more generous view of respondents' misconduct, their failings were that they did not care enough to be scrupulous when other people's lives— literally decades of imprisonment—hung in the balance. They did not care enough to craft a halfway decent motion in limine that disclosed the most exculpatory evidence in the Collins Report. They did not care enough to copy and paste that report's most important findings, or to simply redact whatever "sensitive employment information" animated their decision not to turn over the entire report. They did not care enough to make sure that their fax of the Collins Report had gone through to the court in its entirety. And when the court alerted them to the fact that some pages were missing from their transmission, they did not care enough to take two seconds to look at the entire report that was sitting in Taylor's files right then and there and would have immediately confirmed the court's suspicions; they instead gave the court false assurance that it had the entire report. Neither Roth,

---

[5] It was Dobbie, the more experienced and more senior of the respondents, who was the principal drafter of the motion in limine, who errantly faxed the Collins Report to the court, and who falsely assured the court that it had the entirety of the report. If I put aside the deference owed to the Board's recommendation, I would likely conclude that Dobbie deserves a harsher punishment than what the Board recommends, and perhaps that Taylor deserves a more lenient one given her relative inexperience and lack of involvement in the most egregious misconduct here.

Ragsdale, nor anybody else at the U.S. Attorney's Office can be blamed for respondents' utter lack of care.

Dobbie and Taylor counter that "an *unconscious* failure to disclose cannot be deterred" so they should receive no discipline at all. That is obviously wrong; people can be incentivized not to make unconscious errors. To illustrate, imagine if we were talking about *inculpatory* evidence in the Collins Report—say Morton confessed to the assaults—is there any doubt that the government would have remembered to bring that evidence to the jury's attention? Is it conceivable that they would have "unconsciously fail[ed]" to do so? Of course not, because they are no doubt highly motivated to secure convictions. "[P]rotecting the constitutional rights of the accused was just not very high on th[ese] prosecutor[s'] list of priorities." *United States v. Olsen*, 737 F.3d 625, 631 (9th Cir. 2013) (Kozinski, C.J., dissenting from denial of petition for rehearing en banc).

Or imagine if you had a dog who required a daily medication to stave off a life-threatening malady. If you were boarding that dog for a few weeks, might you "unconsciously fail" to alert the kennel of that essential medication? Is it conceivable that you might omit that fact when writing a summary of the dog's required medications, while instead highlighting a more trivial medication for a mild rash? Would you send the details of those required prescriptions via fax and then

*not* double check to make sure that the fax went through?  If you then received a call from the kennel informing you that it seemed to be missing some of your dog's medical information, is there a universe in which you might glibly brush them aside and assure them that they had everything?  It is unlikely that you would fail at any of those steps; it is inconceivable that you would fail at each of them unless you wanted your dog dead or were indifferent to that possibility.  That is because people generally do not unconsciously and repeatedly fail to relay critical information provided they attach any gravity to it.  And in this case we are not talking about a dog, but human beings.  When these prosecutors repeatedly failed to provide them with information vital to their defense, it can only be because they attached little gravity to the defendants' constitutional rights and liberty interests.  That indifference to a matter that demanded the utmost care should not be tolerated and deserves a serious sanction, as the Board unanimously and cogently explained.

"The fact that a constitutional mandate elicits less diligence from a government lawyer than one's daily errands signifies a systemic problem: Some prosecutors don't care about *Brady* because courts don't *make* them care." *Id.*  The result today is one more datapoint in support of that thesis.  Imposing a meaningful sanction is necessary to instill the extraordinary care that these cases deserve in whatever segment of prosecutors—no doubt a distinct minority—otherwise lack it.

## B. The Majority Downplays a Substantial Aggravating Factor

In addition to misallocating the blame among respondents and their supervisors, the majority also downplays a substantial aggravating factor: respondents' dishonesty. Like me, the majority agrees with the Board and Hearing Committee that Dobbie and Taylor acted dishonestly, and so violated Rule 8.4(c). They find this dishonesty in Dobbie and Taylor's "mischaracterization of the Collins Report's conclusions in the motion in limine and related decision not to 'conced[e]' that Officer Childs 'had made a false and/or misleading statement.'" While the majority says that "[t]here is simply no justifying these misrepresentations," it nonetheless gives them no discernible weight when determining the appropriate sanction.

Dishonesty is one of the enumerated factors that we must take into account when considering an appropriate sanction. *See In re Martin*, 67 A.3d 1032, 1053 (D.C. 2013). My colleagues say the dishonesty here was "problematic," but not "flagrant[]," because it was "confined to one isolated case." *See supra* at 62-63. I do not agree with that assessment—the protracted pattern of dishonesty here cannot fairly be described as isolated—but it does not matter because dishonesty need not be repeated or flagrant to weigh in favor of a six month sanction. "Where we have concluded that the attorney's conduct falls into a category of dishonesty of a flagrant

kind we have held *disbarment* to be the appropriate sanction." *In re Cleaver-Bascombe*, 986 A.2d 1191, 1199 (D.C. 2010) (*Cleaver-Bascombe II*) (per curiam) (emphasis added); *see also In re Howes*, 52 A.3d 1, 15 (D.C. 2012) ("[W]here [] dishonesty is aggravated and prolonged, disbarment is the appropriate sanction."). If Dobbie and Taylor's dishonesty were flagrant, we again would not be debating a six month suspension, but talking about disbarment. When deciding between much lesser sanctions, dishonesty of any kind is an aggravating factor that we must take seriously.

To put things into perspective, the attorney in *In re Cleaver-Bascombe*'s sin was asking to be paid for a single jail visit that did not occur, and then continuing to insist that it had occurred during disciplinary proceedings. *Cleaver-Bascombe II*, 986 A.2d at 1193. We disbarred her. *Id.* Why is it that we see an attorney submitting a false voucher and then continuing to defend it as "demean[ing] their noble calling and bring[ing] disgrace to themselves and to their profession," and worthy of disbarment, *id.* at 1198-99 (citation omitted), but apparently see dishonesty resulting in years of unjust imprisonment as merely "problematic"?

For this reason, too, I am not persuaded to the majority's view that a six month suspension would be inconsistent with *In re Kline*, 113 A.3d 202 (D.C. 2015). In its comparison to that case, the majority overlooks the fact that *In re Kline* did not

involve so much as an allegation of dishonesty—something we attached considerable weight to when declining to suspend the respondent in that case. 113 A.3d at 216. Given the emphasis we have put on dishonesty as an aggravating factor, this case merits a harsher sanction. *See, e.g.*, *In re Daniel*, 11 A.3d 291, 300 (D.C. 2011) ("There is nothing more antithetical to the practice of law than dishonesty."). In fact, it would run counter to our precedents *not* to impose a harsher sanction. *See In re Balsamo*, 780 A.2d 255, 261 (D.C. 2001) ("Where an aggravating element of dishonesty is present, the sanction normally imposed for types of disciplinary violations other than violations of 8.4(c) may be increased."). And six months is unquestionably within the normal range of sanctions for cases involving dishonesty. *See id.* ("For conduct involving 'dishonesty, fraud, deceit, or misrepresentation,' Rule 8.4(c), the discipline this court has imposed has ranged from censure to disbarment."); *In re Guberman*, 978 A.2d 200, 207 & n.7 (D.C. 2009) (citing cases involving false or dishonest statements with sanctions that "range from a suspension of thirty days to a suspension of three years").

A variety of factors compound rather than mitigate respondents' dishonesty. First, putting aside their failures to disclose the exculpatory evidence, Dobbie and Taylor sat idly by as Childs lied in his sworn trial testimony. Childs testified under oath that he was demoted only for making copying and pasting errors. Respondents knew that was false, but did not correct the record. *Vaughn*, 93 A.3d at 1261. They

listened to him say that his demotion was "voluntary" and not the result of any disciplinary action. They again knew better, but did not correct the record. *Id.* They knew both of these things to be untrue, and yet while their witness lied to the jury they sat silently by, in violation of their duty to correct false testimony. *See Longus v. United States*, 52 A.3d 836, 844 (D.C. 2012) ("A bedrock principle of due process in a criminal trial is that the government may neither adduce or use false testimony nor allow testimony known to be false to stand uncorrected.").

Second, even after the trial had concluded, Dobbie and Taylor fought to keep the Collins Report concealed. Morton and Vaughn challenged their convictions in post-trial motions partly on the ground that the court had improperly limited their cross-examinations of Childs. In considering that challenge, the court asked if there was "any reason" not to disclose the Collins Report to the defense "for the purpose of arguing the motion," and Dobbie objected to disclosing it, maintaining that the report should remain under seal with the court. It was only when the court overruled that objection and ordered respondents to disclose the entire report to the defense that respondents' misconduct came to light. At this point, Dobbie and Taylor again had the opportunity to admit their mistakes, but instead they dug in their heels. They filed a supplement to their opposition to Morton's post-trial motion, in which they continued to assert that the motion in limine had adequately disclosed and summarized the Collins report; that it was not clear that Childs had filed a false

report because the text of his report "was found to be misleading" and "was ambiguous at best"; and that, in any case, the Collins report did not contain any *Brady* information.

The Hearing Committee cut Dobbie and Taylor repeated breaks in its factual findings, ultimately crediting their testimony that their actions were mistakes, despite strong evidence to the contrary. So many things had to "go wrong" for Dobbie and Taylor to successfully deprive the defense of this critical exculpatory evidence that it is close to impossible to chalk it up to inadvertence. I nonetheless accept the Hearing Committee's factual findings on this point, despite my view that they toe the line of being belied by the record. *See In re Stuart*, 290 A.3d 20, 27 (D.C. 2023) (per curiam) ("We defer to the Hearing Committee's findings of fact . . . unless those findings are not supported by substantial evidence."). But that just leaves us with the conclusion that Dobbie and Taylor were extraordinarily reckless in a case of considerable gravity. Their degree of recklessness merits the recommended six month suspension.

## C.  A Six Month Suspension Is Fitting for Reckless Conduct

Mere recklessness has never been a bar to serious sanctions. *See In re Gray*, 224 A.3d 1222, 1235 (D.C. 2020) (disbarment for misappropriation of client funds

that was reckless, not intentional); *In re Ekekwe-Kauffman*, 267 A.3d 1074, 1077 (D.C. 2022) (same). And it is not a bar here where a real sanction is necessary.

*Brady* relies on prosecutors to voluntarily disclose exculpatory material. Short of disciplinary sanctions, prosecutors have very little to lose if they violate *Brady*. If they do not disclose *Brady* material, it is likely the defense will never find out (as Morton and Vaughn very nearly failed to uncover the exculpatory evidence here). If the defense somehow does find out, then the convictions will be reversed only if the undisclosed evidence clears the materiality bar.[6] And even when convictions are reversed, the result is typically a second trial in which the prosecutors get a second bite at the apple.

I do not doubt that the vast majority of prosecutors take their *Brady* obligations extremely seriously, but there is nonetheless "a serious moral hazard" for the minority of "prosecutors who are more interested in winning a conviction than serving justice." *Olsen*, 737 F.3d at 630 (Kozinski, C.J., dissenting). It is therefore necessary to sanction prosecutors who violate Rule 3.8(e), in the rare circumstances when those violations come to light, to deter noncompliance with

---

[6] *See* Richard A. Rosen, *Disciplinary Sanctions Against Prosecutors For* Brady *Violations: A Paper Tiger*, 65 N.C. L. Rev. 693, 705 (1987) ("[T]he deterrent effect of a potential reversal has been undermined by the Supreme Court's development of strict materiality requirements in *Brady* cases.").

disclosure obligations. And it is exactly these rare, hard to detect violations where harsh discipline is appropriate. *See Cleaver-Bascombe II*, 986 A.2d at 1199-1200 ("[T]he severity of a sanction should take into account the difficulty of detecting and proving the misconduct at issue." (quoting *Cleaver-Bascombe I*, 892 A.2d at 414 (Glickman, J., dissenting in part))).[7]

## D. The Majority Sows Asymmetry in Our Precedents

Finally, I see this case as a small part of a larger problem. We frequently subject private practitioners to serious sanctions for relatively minor missteps, while we rarely subject public servants to sanctions of the same caliber, even though their misconduct often results in significantly more harm and is at least as morally blameworthy.

We have disbarred private practitioners for misappropriating client funds countless times. "[I]n virtually all cases of misappropriation, disbarment will be the only appropriate sanction unless it appears that the misconduct resulted from nothing more than simple negligence." *See Addams*, 578 A.2d at 191. To take just two examples: In *In re Gray*, a solo practitioner recklessly misappropriated client funds

---

[7] For this reason, I do not agree with the United States, participating as amicus, that any new *Brady* trainings that it has implemented obviate the need for disciplinary sanctions here.

by twice mistakenly overdrawing a client account by about $10,000 because he forgot the funds in the account were being held in trust. 224 A.3d at 1227. Both times, Gray quickly replaced the funds with money from his personal account when the error came to light, so that ultimately nobody was actually harmed. *Id.* at 1227, 1231. We disbarred him. *Id.* at 1235. In *In re Ekekwe-Kauffman*, another solo practitioner was found to have recklessly misappropriated funds from four client accounts by unintentionally drawing out money that belonged to her clients. 267 A.3d at 1077. The largest sum she misappropriated was $2750, and the smallest was $12.35. *Id.* at 1079. We disbarred her too. *Id.* at 1077.

This "relentlessly unforgiving approach to misappropriation" is "difficult to reconcile" with the "substantially greater and sometimes excessive leniency towards violations involving far more dishonorable conduct." *In re Micheel*, 610 A.2d 231, 237 (D.C. 1992) (Schwelb, J., concurring); *see also Addams*, 579 A.2d at 209-10 & nn.16-19 (Schwelb, J., dissenting); *In re Berryman*, 764 A.2d 760, 774 (D.C. 2000) ("[D]isbarment may appear to be quite harsh in this case where [respondent] previously enjoyed a twenty-four year career as an attorney without a single blemish, [and] rendered extraordinary service to [her client]."). This is one of those cases that involves far more dishonorable conduct than the reckless or even intentional misappropriation that would lead us to disbar attorneys without batting an eye.

## II. Conclusion

Dobbie and Taylor, through their actions, sent two men to prison for years on the basis of unreliable testimony, and prevented them from being able to effectively challenge that testimony at trial. Perhaps they did so unintentionally, but we take a ruthless approach to even unintentional accounting errors. And here we are not talking about money that can be restored. We are talking about "the accuracy of the mechanism by which our society deprives individuals of their freedom and their lives."[8] We are talking about four and a half years of people's lives, which stood to be even longer had respondents' misconduct not fortuitously come to light despite their efforts to keep it concealed.

This court has an integral role to play in upholding standards of professional conduct. *See In re Chapman*, 284 A.3d 395, 403 (D.C. 2022) ("[T]he responsibility of 'imposing sanctions rests with this court in the first instance.'" (quoting *In re Godette*, 919 A.2d 1157, 1164 (D.C. 2007))). It is important that we hold civil servants just as accountable as private practitioners, particularly when they wield the vast power of the State. By discarding the Board's recommended sanction and

---

[8] Rosen, *supra* note 6 at 731.

replacing it with what amounts to an admonition, this court shows an unwillingness to hold public servants accountable for the most grievous of attorney misconduct.

It is especially important that we "hold prosecutors accountable in light of their pivotal role in the justice system, the great discretion they are given, and the few tools available to oversee their compliance with the legal standards that govern their conduct." *See In re Howes*, 52 A.3d at 23; *cf. Diaz v. United States*, 716 A.2d 173, 180 (D.C. 1998) ("The prosecutor [] plays a special role in our judicial system and carries unique responsibilities and is expected to know and abide by the rules of the court and [their] profession."). Prosecutors "are the representative of the sovereign, whose 'interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" *Vaughn*, 93 A.3d at 1253 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). But perhaps out of respect for their institutional role, disciplinary bodies rarely sanction prosecutors, and when they do, they often impose no more than a slap on the wrist.[9] Here, the Board comes to us—despite innumerable favorable inferences drawn in respondents' favor—with the rare

---

[9] *See* Thomas P. Sullivan & Maurice Possley, *The Chronic Failure to Discipline Prosecutors for Misconduct: Proposals for Reform*, 105 J. Crim. L. & Criminology 881, 894 & n.54 (2015) (citing articles detailing a lack of discipline); *see also* Rosen, *supra* note 23 at 697 (surveying the lawyer disciplinary bodies in every state and the District and concluding that "despite numerous reported cases showing violations of [disciplinary rules prohibiting prosecutorial suppression of exculpatory evidence], disciplinary charges have been brought infrequently and meaningful sanctions rarely applied").

recommendation of an actual suspension that at least comes close to reflecting the gravity of this serious prosecutorial misconduct. Yet this court balks. I wouldn't.

The recommended six month sanction is well within the range of acceptable outcomes and we should therefore impose it. I respectfully dissent from the majority's contrary conclusion.